[Crim. No. 22356. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN GALEN DAVENPORT, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Donald L. A. Kerson and William Blum, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield, Keith I. Motley and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

REYNOSO, J.—Appellant stands convicted by a jury of murder in the first degree with the special circumstance that the murder was intentional and involved the infliction of torture. The jury fixed the penalty at death. The appeal to this court is automatic.

Appellant makes three challenges to the finding that the murder was committed under special circumstances. (Pen. Code, § 190.2 et seq.)[1] First appellant urges that the torture-murder special circumstance enacted by the initiative measure of 1978 is not sufficiently rational, precise and limited to provide a constitutional basis for imposition of the death penalty. (*Smith* v. *Goguen* (1974) 415 U.S. 566, 572-573 [39 L.Ed.2d 605, 611-612, 94 S.Ct. 1242]; *Godfrey* v. *Georgia* (1980) 446 U.S. 420, 428 [64 L.Ed.2d 398, 406, 100 S.Ct. 1759].) Secondly, appellant contends that the instructions to the jury defining the special circumstance were inconsistent with the definition of first degree murder by torture, and that the combination was likely to have misled the jury on the vital matter of the truth of the special circumstance. (*People* v. *Dail* (1943) 22 Cal.2d 642, 653 [140 P.2d 828].) Finally, appellant argues that the special verdict returned by the jury failed to meet the requirements of sections 190.2 and 190.4, subdivision (a).

We conclude that the special circumstance is reasonably susceptible of a construction which is consistent with constitutional mandates, that the trial court correctly instructed the jury, and that the special verdict met statutory requirements. We therefore affirm appellant's conviction of murder with special circumstances.

Under cases decided by this court and by the United States Supreme Court, however, three instructional errors at the penalty phase of the trial

---

[1]All further statutory references are to the Penal Code, unless otherwise noted.

require reversal of the judgment of death and remand for new penalty proceedings. (*People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813]; *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954]; *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440].)

FACTS

The uncontradicted evidence showed that the victim, Gayle Lingle, spent the evening of March 26, 1980, at the Sit 'N Bull Bar in Tustin, where she talked with appellant and with Larry Richards, both of whom she knew. At one point in the evening she asked Richards to give her a ride home. Richards put her off and appellant offered her a ride. She did not then accept the offer. Later in the evening she telephoned her boyfriend telling him that she had a six-pack of beer and a ride and would be home soon. A few minutes later between approximately midnight and 1 a.m., she and appellant both left the bar. The victim's body was found the next morning lying in a large, uncultivated field south of the I-5 freeway near Tustin.

The area where the body was found is bounded by Myford and Michelle Streets; a dirt berm two to three feet high lies between Myford Street and the field. Between the road and the berm was an area in which items from a woman's purse were scattered among random, twisting footprints. This evidence suggested a struggle had occurred in that location. Behind the berm, about 20-30 feet from the body, was a large pool of bloodied water, a pair of woman's pants, a woman's underpants, and a pair of boots. There were two sets of motorcycle tracks in the area. One set left and re-entered Myford in the area of struggle. The second set of tracks led from Myford, over the end of the dirt berm within four to five feet of the body, and back to the street.

Appellant's nickname was "Honda Dave." Police learned that he had left the Sit 'N Bull with the victim on the night of her death and that he rode a 350 cc Honda motorcycle. On March 28 the officers, who had a warrant to arrest appellant for an unrelated traffic offense, entered the open carport at appellant's home where they examined and photographed the tires on appellant's bike. The examination indicated a possible match between the tracks at the murder scene and the tread on appellant's tires. The officers went to the house and arrested appellant.

The prosecution produced three eyewitnesses who placed a motorcycle similar to one owned by appellant at the murder scene between 12:30 and 1:30 a.m. on March 27. The first witness had left his workplace on Myford Road shortly after 1 a.m. As he passed by the intersection of Michelle and

Myford he saw a motorcycle parked beside the road which looked similar to a 350 cc Honda that his son owned. The second witness testified that she also had driven past the intersection about 12:30 a.m. and that she had seen a motorcycle parked off the road near a telephone pole. She had seen a man crouched on the far side of the dirt berm. The man wore a plaid shirt and had shoulder length hair. She could not ascertain the nature of his activity. The motorcycle was dark in color, and of a foreign, probably Japanese, make. This witness did not identify appellant. A third witness testified that she had driven around that corner at 12:35 a.m. As her headlights swept the field she saw a parked motorcycle and a man who was crouched over and appeared to be digging. The motorcycle resembled the bike belonging to the appellant which was in the courtroom as a prosecution exhibit. The man was white and had collar length hair. She saw his face when he briefly looked into her headlights. Prior to trial this witness had picked appellant's photo as one of three which could have been the man she saw. She was unable to select appellant from a live lineup. At trial the district attorney displayed the photographic line-up from which the witness had originally selected several pictures. She selected a photograph of appellant and testified that she thought that was the person she had seen in the field although she could not be positive that it was.

Three expert witnesses testified to facts that connected defendant's motorcycle to the crime. Bonnie Driver, a criminalist employed by the Orange County Sheriff's Department, testified that she had examined vegetable matter taken from appellant's motorcycle and compared it with vegetation taken from the area where the victim's body was found. Driver found the gross morphology of the plants in both samples to be consistent with each other. A forensic microscopist, Skip Pallinick, examined and compared the heavy mineral content of soil samples taken from appellant's bike with samples taken at the murder scene. He testified that the samples were generally consistent with each other. One of the samples from the motorcycle contained sufficient similarity to the murder scene samples that the witness concluded they were virtually indistinguishable. Both of these witnesses admitted they had not compared the samples taken from appellant's bike with samples taken from other parts of Orange County. Dr. Stephen Dana, a geologist retained by the defendant, examined the same soil samples and found similarities and differences in all of them. Based on his knowledge of the geology of the area Dr. Dana opined that the samples could have come from anywhere in Orange County.

Jack Leonard, the production manager for the International Sport and Rally Division of Dunlop Tire Company, testified that appellant's motorcycle could have made the tracks at the scene. Mr. Leonard had examined plaster casts of the tracks found near the victim's body and the actual tires

on appellant's motorcycle. He found that the tracks of the rear tire had the same highly unique and distinctive characteristics as the rear tire of the motorcycle. Both were Dunlop brand motorcycle tires, size 4.00-18 with a K-70 tread pattern. Both were characterized by a defect in a portion of the tread pattern known as the cross-slot. The defect was caused by damage to the upper half of the manufacturing mold. Mr. Leonard testified that tires with such blemishes are routinely removed from the regular production line. They are sold as "blems" at a reduced price but pursuant to trade restrictions are not shipped to the U.S. It was Leonard's opinion that not more than two or three tires with this defect which were manufactured at the same time and place as the tire on appellant's bike would have eluded inspectors and been shipped to the U.S. Similar tires are currently manufactured in the U.S., but the steel utilized for the molds here is stronger than the aluminum used in Britain and not subject to the kind of breakage which caused this defect. The witness also explained that it was unusual for a nine-year-old tire to show only 40 percent wear, as did the tire on appellant's motorcycle.[2] The vast majority (95 percent) of similar tires are completely worn out after five or six years of use. This degree of wear was consistent with the tracks at the scene. Finally, Leonard testified that the track of the front motorcycle tire at the scene showed a tread pattern which he recognized as a Bridgestone tire, similar to the front tire on appellant's motorcycle.

The nature of the charge against appellant requires that we describe the grotesque details of the condition of the victim's body and the cause of her death. The body, nude except for a sweater draped over the upper torso, had suffered numerous and extensive stabbing and slashing wounds about the neck, chin and jaw as well as defensive wounds to the hands and forearms. The victim's carotid artery had been severed. Her breasts were bruised. A long wooden stake had been inserted into her rectum. An autopsy revealed that the stake was forced deeply into the body, injuring various internal organs and tissues before it came to rest just under the right armpit.

The autopsy pathologist, Dr. Walter Fischer, testified that the cause of death was the loss of blood from the carotid artery, and that the insertion of the wooden stake was a contributing factor. Dr. Fischer testified that it was his opinion that the victim was alive at the time the wooden stake was inserted, because the 200 cc's of blood which he found in the pleural cavity could only have been pumped out of the perforation in the lung by a beating—and thus living—heart. Dr. Fischer did not believe that the surprisingly small amounts of blood found at the point where the stake contacted the

---

[2]Code numbers on the rear tire of appellant's bike showed it had been manufactured in the spring of 1972 in Leicester, England and indicated the particular mold that had been used.

anus and liver contradicted his conclusion. He attributed the lack of further bleeding to the probability that the victim's body had entered a state of shock after the carotid artery was cut and before the stake was inserted. When in shock, he explained, blood is channeled to the most vital organs— primarily the brain, heart and lungs—and the vessels in organs of lesser immediate importance, such as intestines, contract.

Dr. Fischer testified that the neck and hand wounds had probably occurred before the penetration of the stake. He testified that the victim could have lived from 5 to 20 minutes after the artery was severed. He could not offer a medical opinion that the victim was or was not conscious when the stake was inserted.

Dr. Renee Modglin, an experienced pathologist, reached different conclusions. Based on an examination of photographs of the victim's body and Dr. Fischer's autopsy report, Dr. Modglin formed the professional opinion that the stake had probably entered the victim's body after her death. He suggested blood could have entered the lung either through one of the initial cuts in the carotid artery or during post-mortem movements of the body. He offered his opinion that a state of shock would not have prevented bleeding in all of the areas which the stake had contacted.

The prosecution also called as a witness John Farmer who testified to incriminating admissions appellant made to him while both were in a holding cell at the Orange County Superior Court at various times between September 8, 1980, and December 19, 1980. According to the testimony, appellant told Farmer he had killed a girl, that he had sodomized her while she yelled for him to stop, that he had stabbed her and tried to cut off her head but could not succeed because his knife was too small. Appellant said that after he stabbed her, he had lowered the girl's body onto a wooden stake because he wanted to make a scarecrow of her. When the stake came out of the ground, he had pushed and kicked it further into her body. According to Farmer, appellant variously said he had killed her because she had sexual relations with another man and because she had led appellant on.

Appellant's testimony was consistent with that of the other witnesses who had been at the Sit 'N Bull Bar on March 26. After cashing his paycheck at a local bowling alley, he had gone to the bar around 8:30. There he played pool, drank beer and visited with people. He was acquainted with the victim and with her boyfriend. Lingle had asked Larry Richards for a ride home but Richards said she would have to wait until he finished playing pool. Appellant had then offered her a ride but she had not replied. Some time later after she indicated she wished to purchase some beer to take home appellant bought her a six-pack. His motive was to return the favor the

victim and her boyfriend had done for appellant when he was too broke to buy himself a drink. He walked out of the bar with her and carried the beer. In the parking lot he gave her the six-pack and again offered her a ride; she again declined. Appellant left on his motorcycle and went to a nearby coffee shop, alone, and drank two cups of coffee. He then went home to bed. The following morning appellant got up at a quarter to seven, showered and headed for his job at Apri Cosmetics, in Orange. He was due to begin work at 8 a.m. but his motorcycle developed a flat tire in Tustin. Appellant stopped and called his supervisor. At 8:30 a.m. he purchased a new inner tube from Tustin Honda and changed the tire. He arrived at work at 9:30 a.m.

Appellant's girlfriend testified that she had gone to sleep at 10 p.m. on March 26. Appellant was not at home at that time but was in their bed when she awoke at 6 the following morning. Appellant was dressed only in his undershorts and she could see his arms, legs and torso. There were no cuts, scratches or blood on him. She had heard no sounds during the night which indicated he had showered or cleaned himself or his clothes.

Susan Stock, appellant's supervisor at Apri Cosmetics, testified that she had tried to verify appellant's excuse for being tardy on March 27. She had examined the bike and formed the opinion that neither tire had recently been changed. Officer Veach, an investigator for the Irvine Police Department examined the tires on appellant's motorcycle after his arrest. He also formed the opinion that neither tire had been recently changed. Paul Jorgensen, the manager of Tustin Honda, testified that the business opened at 9 a.m. and that his sales records for March 27 showed no sale of a motorcycle tube such as that appellant claimed to have purchased.

I

Section 190.2 provides for the penalty of death or life imprisonment without the possibility of parole when a defendant is found guilty of first degree murder committed under the special circumstance that "the murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration." (§ 190.2, subd. (a)(18).)

Appellant contends that this special circumstance is irrational, vague and overbroad in that it fails to "meaningfully narrow the group of persons subject to the death penalty and serves only as a vehicle for arbitrary and capricious action, to be used whenever jurors and prosecutors, in their sole and unguided discretion, so desire." This, he contends, violates constitutional principles governing application of the death penalty, specifically that

which calls for the state to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." (*Godfrey* v. *Georgia, supra,* 446 U.S. 420, 428 [64 L.Ed.2d 398, 406].)[3]

Appellant's argument focuses on four aspects of the special circumstance; two relate to the intent of the accused and two involve the experience of the victim. He asserts that the literal language of section 190.2, subdivision (a)(18) fails to require that the defendant have either the specific intent to kill the victim (see, *People* v. *Velasquez* (1980) 26 Cal.3d 425, 434 [162 Cal.Rptr. 306, 606 P.2d 341]) or the specific intent to torture (cf. *People* v. *Wiley* (1976) 18 Cal.3d 162 [133 Cal.Rptr. 135, 554 P.2d 881]). Thus, the defendant's state of mind need be no more culpable than that of any other murderer. Appellant further argues that the infliction of extreme pain on the victim is characteristic of most murders (see, *People* v. *Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51]; *People* v. *Caldwell* (1955) 43 Cal.2d 864, 868-869 [279 P.2d 539]; *People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People* v. *Bender* (1945) 27 Cal.2d 164, 177 [163 P.2d 8]) and is therefore not a valid criterion for imposition of capital punishment. Finally, appellant asserts that the statute requires proof that the victim subjectively experienced extreme pain prior to death. Since it is highly improbable that the prosecution would ever be able to produce direct evidence of the experience of the deceased, appellant claims this element invites arbitrary and capricious imposition of the statute.

Appellant contrasts these aspects of section 190.2, subdivision (a)(18) with the requirements of former section 190.2, subdivision (c)(4), the death penalty law enacted in 1977. That statute designated as one form of capital murder a murder which was willful, deliberate and premeditated and which involved the infliction of torture. Torture under former section 190.2, subdivision (c)(4) required proof of the intent to inflict extreme and prolonged pain.[4]

According to appellant section 190.2, subdivision (c)(4), unlike the present special circumstance, successfully isolated those situations in which the victim died a lingering and prolonged death. From the changes in the lan-

---

[3]Appellant's argument is based solely on the restrictions placed upon statutes which may subject a criminal defendant to the death penalty by the Eighth and Fourteenth Amendments to the United States Constitution and the due process clause (art. I, § 7) of the California Constitution. He explicitly declines to argue that section 190.2 subd. (a)(18) fails to give adequate notice of proscribed criminal conduct. (Cf. *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76].)

[4]Former section 190.2, subdivision (c)(4) designated as a special circumstance that "The murder was willful, deliberate and premeditated, and involved the infliction of torture. For the purpose of this section, torture requires proof of an intent to inflict extreme and prolonged pain." (Stats. 1977, ch. 316, § 9.)

guage describing torture, appellant infers a legislative intent to change the meaning of the special circumstance. (See, e.g., *Whitley* v. *Superior Court* (1941) 18 Cal.2d 75, 79 [113 P.2d 449].) Specifically, he infers an intent to eliminate the requirement that the defendant intend to inflict torture and the definition of torture as an act or acts causing extreme and prolonged pain to the victim. Appellant asserts the elements of the new special circumstance—an intentional killing in which extreme physical pain is inflicted—are illusory limitations. Neither provides a basis for separating capital crimes from other murders which is rational and tailored to the defendant's personal responsibility and moral guilt, (see, *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368]; *Furman* v. *Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726] (conc. opn. of White, J.)).

 Appellant's claim that the special circumstance does not require a specific intent to kill is easily refuted.[5] The words "intention" and "intentional" are used throughout the Penal Code to describe a state of mind in which a defendant acts for the purpose or with the desire of causing a particular result.

The term "intentional" is used in section 188 to define malice, the state of mind which renders an unlawful killing murder. ("[Malice] is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.") It is used in 10 of the special circumstances of section 190.2, subdivision (a). (E.g., subd. (a)(1): "The murder was intentional and carried out for financial gain.") The concept is so fundamental that in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] this court held that subdivision (a)(17) of section 190.2 must be construed to require proof that the defendant intended to kill. (*Id.,* at p. 154.)

*People* v. *Velasquez, supra,* 26 Cal.3d 425, upon which appellant relies, did not hold that an intentional killing may be proved by showing the killer acted with implied malice. Malice is implied under section 188 when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (*People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1].) *Velasquez* simply reiterated that "'[f]or a result to be caused "intentionally," the actor must either desire the result or know, to a substantial certainty, that the result will occur.' [Citation.]" (26 Cal.3d at p. 434.)

---

[5]When arguing that the jury instruction on the special circumstance was misleading, appellant himself makes the inconsistent assertion that the special circumstance requires a finding of an express intent to kill.

Nor does the subdivision's employment of intentional murder in lieu of a willful, deliberate and premeditated murder necessarily reduce the culpability of the mental state of a capital defendant. According to the first paragraph of subdivision (a) special circumstances are applicable only to cases where the defendant is found guilty of first degree murder. Thus, the defendant must be found to have had either a willful, deliberate and premeditated intent to kill, or some other mental state which has historically been deemed to be equally culpable. (See, § 189; *People* v. *Wiley, supra,* 18 Cal.3d 162, 170.)

 The definition of torture, however, presents a more difficult problem. Appellant urges that the 1978 statute requires proof of an intentional killing in which the victim is sufficiently conscious to subjectively experience the extreme pain which inevitably precedes such a violent death. According to his interpretation, subdivision (a)(18) does not require that the defendant have an intent to inflict torture which is distinct from the intent to kill. He further urges that the required proof of the victim's suffering is either meaningless for special circumstance purposes because it is characteristic of most murders or is impossible because it depends upon proof of the subjective impressions of the deceased. ██ As interpreted he asserts the special circumstance would be capable of application to virtually any intentional, first degree murder.[6]

---

[6]Appellant reaches his interpretation by relying on two principles of statutory construction. First, he presumes the legislative body was aware of the wording of section 189 and former section 190.2, subdivision (c)(4) (*Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000, 1010 [181 Cal.Rptr. 486]) as well as of existing domestic judicial decisions interpreting the sections, and that it amended the special circumstance statute in light of such statutory language and judicial decisions. (See, *Estate of McDill* (1975) 14 Cal.3d 831, 837-839 [122 Cal.Rptr. 754, 537 P.2d 874]; *In re Phyle* (1947) 30 Cal.2d 838, 845 [186 P.2d 134].) Then he applies the principle that "[w]hen substantial changes are made in the statutory language it is usually inferred that the lawmakers intended to alter the law in those particulars affected by such changes." (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155].)

The Attorney General, on the other hand, asserts that the assumption that a change in language evidences a legislative intent to alter the law cannot be strictly applied to the 1978 special circumstance statute because it was enacted through the initiative process rather than by the Legislature. The initiative process, he urges, is not one in which words are deleted from statutes with surgical precision. Therefore, the change in the statutory language should not be literally construed so as to result in an unconstitutional statute.

We recognize that in California initiatives are written and enacted without the benefit of the hearings, debates, negotiation and other processes by which the Legislature informs itself of the ramifications of its actions. Thus there may be some basis for the argument that some of the principles which guide courts in their efforts to ascertain the intent of particular statutory provisions enacted through the legislative process may not carry the same force and logic when applied to an initiative measure.

The courts have not heretofore recognized different rules for interpreting statutes enacted by initiative, however, and we do not now decide whether it might be appropriate to do so in some future case. The presumption that the legislating body intended to enact a valid statute applies to measures enacted by initiative as well as those enacted by the Legislature.

■ Appellant avoids the crucial inquiry, however, because it is established that where "'the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution.'" (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669], quoting *County of Los Angeles* v. *Legg* (1936) 5 Cal.2d 349, 353 [55 P.2d 206].) This follows from the presumption that the legislative body intended to enact a valid statute, which presumption has been applied to initiative measures as well as to legislative enactments. (See, e.g., *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, 147-148; *Assoc. Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, 598.) The United States Supreme Court has explained that the rule in favor of a construction which upholds a statute's validity "plainly must mean that where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." (*United States* ex rel *Atty. Gen.* v. *Delaware and Hudson Co.* (1909) 213 U.S. 366, 407-408 [53 L.Ed. 836, 849, 29 S.Ct. 527]; quoted in *Carlos* v. *Superior Court, supra,* 35 Cal.3d at p. 148.)

■ The cases of *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and *Godfrey* v. *Georgia* (1980) 446 U.S. 420 [64 L.Ed.2d 398, 100 S.Ct. 1759] indicate that appellant's interpretation of section 190.2, subdivision (a)(18) would present significant questions about the constitutionality of the statute as a capital punishment law. In *Gregg* the Supreme Court declined to find unconstitutional on its face Georgia Code section 27-2534.1(b)(7) (1978), which permitted capital punishment for a murder which "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." A plurality of the court reasoned that even though it was arguable that any murder involves depravity of mind or an aggravated battery, there was no basis for assuming that the Supreme Court of Georgia would adopt such an open-ended and constitutionally suspect construction. (428 U.S. at p. 201 [49 L.Ed.2d at p. 890] (opn. of Stewart, Powell and Stevens, JJ.).)

Four years later the United States Supreme Court reversed a death sentence imposed pursuant to section 27-2534.1 (b)(7) because the Georgia courts had not applied a constitutional construction of the statute to the petitioner. (*Godfrey* v. *Georgia, supra,* 446 U.S. 420.) In other cases the Georgia Supreme Court had construed the statute to require a showing that

---

(See, e.g., *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 147-148 [197 Cal.Rptr. 79, 672 P.2d 862]; *Assoc. Home Builders, etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]) and this principle governs our resolution of this case.

the offense had involved torture, depravity of mind, an aggravated battery to the victim, or all three factors. (*Harris* v. *State* (1976) 237 Ga. 718 [230 S.E.2d 1]; *Blake* v. *State* (1977) 239 Ga. 292 [236 S.E.2d 637]; see, 446 U.S. at pp. 429-432 [64 L.Ed.2d at pp. 406-409].) But in Godfrey's case, "[t]he Georgia courts did not . . . so limit § (b)(7). . . . No claim was made, and nothing in the record before us suggests, that the petitioner committed an aggravated battery upon his wife or mother-in-law or, in fact, caused either of them to suffer any physical injury preceding their deaths. Moreover, in the trial court, the prosecutor repeatedly told the jury—and the trial judge wrote in his sentencing report—that the murders did not involve 'torture.' Nothing said on appeal by the Georgia Supreme Court indicates that it took a different view of the evidence. The circumstances of this case, therefore, do not satisfy the criteria laid out by the Georgia Supreme Court itself in the *Harris* and *Blake* cases." (446 U.S. at p. 432 [64 L.Ed.2d at pp. 408-409].)

In answer to the question of whether the Georgia Supreme Court could be said to have applied a constitutional construction of the phrase "outrageously or wantonly vile, horrible or inhuman" to the petitioner, the high court concluded the Georgia court had not: "The petitioner's crimes cannot be said to have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. [Fn. omitted.] They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes. These factors certainly did not remove the criminality from the petitioner's acts. But, as was said in *Gardner* v. *Florida,* 430 U.S. 349, 358 [51 L.Ed.2d 393, 402, 97 S.Ct. 1197], it 'is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.' [¶] That cannot be said here. There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not. . . ." (446 U.S. at pp. 432-433 [64 L.Ed.2d at p. 409], opn. of Stewart, Blackmun, Powell and Stevens, JJ.)

Appellant's proposed interpretation of California's torture-murder special circumstance presents significant constitutional questions under *Godfrey.* This court has observed on numerous occasions that in most murders, presumably severe pain precedes the death of the victim. (*People* v. *Wiley,* *supra,* 18 Cal.3d at p. 173; *People* v. *Tubby, supra,* 34 Cal.2d at p. 77.) Thus, a special circumstance which requires only an intentional killing in which the victim suffered extreme pain would be capable of application to virtually any intentional, first degree murder with the possible exception of those occasions on which the victim's death was instantaneous. Such a dis-

tinction may have nothing to do with the mental state or culpability of the defendant and would not seem to provide a principled basis for distinguishing capital murder from any other murder.

If these questions about the constitutional validity of the statute may be avoided by adopting an alternate construction which is consistent with the statutory language and purpose, it is our duty to adopt the alternate construction. (*Carlos* v. *Superior Court, supra,* 35 Cal.3d 131; *In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142].)

In considering alternatives to appellant's interpretation we are guided by several principles. ▉ First, this court has recognized that it may look to the "common understanding and practices" and to "any demonstrably established technical or common law meaning of the language in question" in order to determine whether the statute is sufficiently certain to meet the constitutional requirements of due process of law. (*People* v. *Barksdale* (1972) 8 Cal.3d 320, 327 [105 Cal.Rptr. 1, 503 P.2d 257].) Section 7, subdivision 16 echoes this principle when it directs that words which have acquired a peculiar and appropriate meaning in the law be construed according to that meaning. ▉ This court has recognized that the legislative body has the power to define torture for purposes of the special circumstance in a manner which differs from its definition under section 189, so long as the resulting statute is within constitutional limits. (*People* v. *Robertson, supra,* 33 Cal.3d 21, 51.) However, it should not be presumed that the legislative body intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].)

▉ The purpose and effect of the 1978 initiative were, according to the legislative analysis which appeared in the voters' pamphlet, to increase the penalties for first and second degree murder, to expand the list of special circumstances and to revise the law pertaining to matters considered at the penalty phase of a capital trial. (Ballot Pamp., Initiative Statute, Gen. Elec. (Nov. 1978) Prop. 7.) Nothing in the analysis or in the arguments of the proponents of the initiative makes any reference to the purpose or effect of the specific changes in the torture-murder special circumstance. We are thus left to discern what legislative intent we can from the language of the subdivision, its relationship to the larger statutory scheme, and its relation to the recognized meaning of the terms used.

The key to the meaning of the special circumstance must lie in the use and definition of the word torture, which has a well-established meaning in the decisional law of this state. Applying the rules set forth above, we are

compelled to conclude that the electorate which enacted subdivision (a)(18) intended to incorporate so much of the established judicial meaning of torture as is not inconsistent with the specific language of the enactment.

"Torture has been defined as the 'Act or process of inflicting severe pain, esp. as a punishment, in order to extort confession, or in revenge.' (Webster's New Internat. Dict. (2d Ed.).) The dictionary definition was appropriately enlarged upon by this court in its original opinion in *People v. Heslen,* 163 P.2d 21, 27 in the following words: 'Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death. That is, the killer is not satisfied with killing alone. He wishes to punish, execute vengeance on, or extort something from his victim, and in the course, or as the result of inflicting pain and suffering, the victim dies. . . .' (See disposition of that case on rehearing, 27 Cal.2d 52.)" (*People v. Tubby, supra,* 34 Cal.2d at p. 77.)

█ Penal Code section 189 makes a murder which is perpetrated by means of torture a murder of the first degree. The essential elements of the crime are: "'. . . (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose.'" (*People v. Wiley, supra,* 18 Cal.3d 162, 168.) The defendant need not have an intent to kill the victim—the malice element of murder may be supplied by an intentional act involving a high degree of probability of death which is committed with conscious disregard for human life. (*People v. Mattison* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193]; *People v. Steger* (1976) 16 Cal.3d 539 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People v. Wiley, supra,* 18 Cal.3d 162, 168.) But there must be a causal relationship between the torturous act and the victim's death. (§ 189; *People v. Wiley, supra.*)

This court has observed that "The history of section 189 and our construction of its language establish that this type of murder was categorized as first degree murder because the Legislature intended that the *means* by which the killing was accomplished be equated to the premeditation and deliberation which render other murders sufficiently reprehensible to constitute first degree murder. A murder by torture was and is considered among the most reprehensible types of murder *because of the calculated nature of the acts causing death,* not simply because greater culpability could be attached to murder in which great pain and suffering are caused to the victim. (*People v. Steger* (1976) 16 Cal.3d 539, 544-546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].)" (*People v. Wiley, supra,* 18 Cal.3d at pp. 168-169, second italics added.)

It is thus apparent that the intent to inflict torturous pain and suffering on the victim is at the heart of the crime of first degree murder perpetrated by torture. ■ As a corollary to the emphasis on the acts and intention of the perpetrator, it has long been held that awareness of pain by the victim is not an element of first degree murder by torture. (*People* v. *Wiley, supra; People* v. *Bender* (1945) 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Tubby, supra,* 34 Cal.2d 72 [207 P.2d 51].) In *Tubby* the court observed that "[i]n determining whether the murder was perpetrated by means of torture the solution must rest on whether the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death." (34 Cal.2d at p. 77.)

In *Wiley* the appellant argued that actual awareness of pain by the victim is an element of murder by torture. The court rejected this contention, stating that "[a]ttempts to measure the amount of pain, if any, suffered by victims of torturous acts, some of whom like William [the victim], may have been rendered insensitive to pain by alcohol or drugs, others of whom mercifully may have been quickly rendered unconscious at the outset of the homicidal assault, not only promises [*sic*] to be futile, but are unnecessary. The Legislature did not make awareness of actual pain an element of torture-murder. Although it has been assumed in past opinions in torture-murder cases that the victim probably felt pain, it does not follow that awareness of pain is an element of the offense. The murderer who exhibits 'the cold-blooded intent to inflict pain for personal gain or satisfaction' may not assert the victim's condition as a fortuitous defense to his own deplorable acts." (*People* v. *Wiley, supra,* 18 Cal.3d at p. 173.)

Just as proof that the victim experienced cruel pain is not required, the nature of the victim's wounds is not determinative. While the severity of the injury may provide the basis for an inference that the killer harbored the required intent to torture, it does not necessarily compel that conclusion. (*People* v. *Steger, supra,* 16 Cal.3d at p. 547.) We have reversed convictions based on a torture-murder theory in spite of the extreme gruesomeness of the crime where the evidence showed that the killing resulted from "an explosion of violence" or "an act of animal fury produced when inhibitions were removed by alcohol." (*People* v. *Tubby, supra,* 34 Cal.2d at pp. 77-78; *People* v. *Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43].)

We have seen that when torture is the means of committing murder, the murder is of the first degree. But the concept of torture has meaning inde-

pendent of its role in causing death. In order to determine whether a first degree murder by torture has occurred "the question which must first be answered is whether there was 'torture' within the meaning of the statute. It is possible to inflict severe and prolonged pain on another without deliberation or premeditation, but it may not be torture under section 189." (*People* v. *Steger, supra,* 16 Cal.3d 539, 546, fn. 2 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].)

■■■ The 1977 special circumstance was explicit in its description of the torturous intent which brings certain first degree murders within the ambit of the death penalty law: the statute required an intent to inflict extreme and prolonged pain. This definition was consistent with the torturous intent which is present in a murder perpetrated by means of torture according to *People* v. *Steger, supra,* 16 Cal.3d 539 at page 546.

The 1978 law, on the other hand, omits any description of any intent other than the intent to kill. Subdivision (a)(18) defines torture for purposes of the section as "the infliction of extreme physical pain, no matter how long its duration."

It seems clear that by this language the legislative body meant to foreclose any requirement that the defendant be proved to have intended to inflict prolonged pain; under subdivision (a)(18) pain which is excruciating but which does not extend over a lengthy period of time is sufficient. This interpretation is consistent with the known legislative purpose of expanding the reach of California's death penalty law and does not raise any significant constitutional question.

It seems also that the language defining torture for purposes of subdivision (a)(18) focuses on the victim's experience of pain. The significance of this focus is ambiguous however. It is possible to read the statute as does appellant, to require proof of the victim's conscious, psychological experience of pain while rendering the mental state of the perpetrator irrelevant. But such an interpretation would run afoul of three basic rules of construction which we have discussed above. It would overthrow the long-established definition of torture, lead to a possibly absurd result, and raise grave questions as to the constitutional validity of the statute.

In *People* v. *Wiley, supra,* 18 Cal.3d 162, this court explicitly rejected the theory that a torture victim must be proved to have been aware of the extreme pain inflicted by the torturous act as an endeavor which would be both futile and unnecessary. "'[I]t is the state of mind of the torturer—the cold blooded intent to inflict pain for personal gain or satisfaction'" which sets the torture murderer apart from others who kill with malice afore-

thought and makes murder by torture one of the most reprehensible crimes that may be committed. (18 Cal.3d at p. 173.) This conclusion flows from the court's explanation in *People* v. *Tubby, supra,* 34 Cal.2d 72 that it is the perpetrator's intent to make the victim suffer cruel pain in addition to death which is the quintessential element of torture.

In addition to departing from the settled definition of torture, requiring proof of the subjective experience of each individual victim might lead to an impossible and thus absurd result. Appellant urges that the perception of pain is a highly personal experience which depends upon an individual's cultural learning, the meaning the person attaches to the situation in which the physical stimuli are received, and other factors which are unique to the functioning of each individual. (Citing, Bresler, Free Yourself From Pain (1979) at p. 56; Melzack, The Puzzle of Pain (1973) at pp. 21, 29.) Thus, appellant argues the law cannot rationally rely on a direct causal relationship between a physical wound and the victim's experience of pain.

Unless it can be shown by the person's own statement, proof of state of mind must necessarily be made by way of an inference from a person's actions or the circumstances surrounding them. A murder victim is necessarily incapable of providing direct proof of his or her experience. Appellant's interpretation of the statute would thus lead to the absurdity of requiring proof which is virtually impossible.

Finally, appellant's interpretation—by omitting that element which has historically been considered to render torture murder more reprehensible than other murders and inserting an element which may be incapable of proof—raises significant questions about the constitutional validity of the special circumstance as a rational basis for distinguishing those murderers who deserve to be considered for the death penalty from those who do not. (See, *Godfrey* v. *Georgia, supra,* 446 U.S. 420.) We cannot assume that the electorate intended such a result unless such a purpose is clear from some statement of intent or from the express wording or necessary implication of the terms of the statute.

We have already observed the dearth of evidence of legislative intent which accompanied the particular alterations in the torture/murder special circumstance (*ante,* at pp. 266-267.) We find neither express words nor a necessary implication that the statute be construed according to appellant's interpretation. There is instead a reading of the statutory language which is more reasonable, which comports with the stated purpose of the initiative to expand the application of the death penalty, and which results in a statute which is constitutional. It is our duty to adopt this construction in order to preserve the constitutional validity of this enactment by the electorate.

First of all, the torturous intent of the perpetrator is of such well-established significance that we cannot believe the legislative body in this instance intended to remove the requirement from the special circumstance. The very use of the term torture to describe the class of murders to which the subdivision applies necessarily imports into the statute a requirement that the perpetrator have the sadistic intent to cause the victim to suffer pain in addition to the pain of death, which intent is distinct from the intent to cause the victim's death. (E.g., *People* v. *Tubby, supra,* 34 Cal.2d 72, 77.)

Secondly, we do not believe that proof of the infliction of extreme physical pain was intended to encompass or necessarily encompasses proof of the subjective experience of the victim. To inflict commonly means to cause to suffer. (See, Webster's New World Dict. (2d college ed. 1974).) Thus to inflict pain means to cause someone to suffer pain. Pain is commonly understood to describe a state of either physical or mental discomfort. (*Ibid.*) Whatever the scientific merit to appellant's argument that the extent of pain can only be measured by reference to something that occurs in the mind, the statutory requirement of the infliction of extreme *physical* pain emphasizes the concern with the physical rather than the mental experience of the victim. The evident purpose of the statute is to encompass killings in which the perpetrator intentionally performed acts which were calculated to cause extreme physical pain to the victim and which were inflicted prior to death.

In sum, we find that the words used in section 190.2, subdivision (a)(18) must be understood in light of the established meaning of torture. Proof of a murder committed under the torture-murder special circumstance therefore requires proof of first degree murder, (§ 190.2, subd. (a)), proof the defendant intended to kill and to torture the victim (§ 190.2, subd. (a)(18)), and the infliction of an extremely painful act upon a living victim. (*Ibid.*) The special circumstance is distinguished from murder by torture under section 189 because under section 190.2, subdivision (a)(18) the defendant must have acted with the intent to kill.

II

The trial court instructed the jury according to the standard definitions of premeditated and deliberate first degree murder, first degree murder perpetrated by means of torture, and second degree murder. When it denied the defense's motion to strike the special circumstance as unconstitutionally vague, the court announced it would read the special circumstance to require proof of an intent to inflict torture. The court instructed the jury for purposes of the special circumstance that ". . . To prove the infliction of tor-

ture the intentional infliction of extreme physical pain must be proved no matter how long its duration." (CALJIC No. 8.81.18 as modified.)[7]

■ Appellant asserts that there were apparent inconsistencies between this instruction on the special circumstance—which required findings of intent to kill and suffering by the victim—and the instruction under section 189—which did not require intent to kill but did require intent to cause cruel pain and suffering for some sadistic purpose.[8] He claims the court failed to adequately explain to the jury the difference between first degree murder by torture and the special circumstance. This, he argues, must inevitably have led to confusion in the minds of the jurors on a matter vital to the judgment and is reversible error. (*People* v. *Dail* (1943) 22 Cal.2d 642, 653 [140 P.2d 828].)

Here, however, the jury was reminded throughout the trial proceedings of the difference between a verdict of first degree murder and a verdict on the alleged special circumstance. The difference was explained during voir dire, in the court's formal instructions and was referred to in arguments of both counsel. The jury was instructed that they must find a first degree murder pursuant to section 189 before they could consider the truth of the special circumstance. Written copies of the court's instructions were available to them during deliberations. Unlike the *Dail* case (22 Cal.2d 642) upon which appellant relies, the jurors were not misled by the giving of one erroneous and one correct instruction covering the same subject. They were clearly and correctly instructed according to the law applicable to the distinct issues of first degree murder and murder involving torture under section 190.2, subdivision (a)(18).

---

[7]CALJIC No. 8.81.18 as modified reads: "To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved:

"1. That the murder was intentional, and

"2. That the murder involved the infliction of torture.

"To prove the infliction of torture, the intentional infliction of extreme physical pain must be proved no matter how long its duration."

[8]The standard instruction on first degree murder by torture was given as follows:

"Murder which is perpetrated by torture is murder of the first degree.

"The essential elements of such a murder are (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any sadistic purpose.

"The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain.

"Unless you find beyond a reasonable doubt that the insertion of the stake into the rectum of the deceased was a contributing cause of death you cannot find murder by torture."

III

■ Section 190.4 requires the jury in a capital case to make a "special finding" on the truth of each alleged special circumstance. The jury here returned their verdict on the form provided which stated they found it to be true "that the special circumstance exists, to wit: murder involving the infliction of torture as alleged in the information." Appellant argues this verdict was not sufficiently specific to meet the requirements of the statute. We do not agree.

Section 190.4, subdivision (a) provides: "Whenever special circumstances . . . are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to subdivision (b) of section 190.1. [¶] In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that is [sic] not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true . . . ."

Appellant asserts that the term "special finding" is synonymous with the "special verdict" defined in section 1152, and in Code of Civil Procedure sections 624 and 625: "A special verdict is that by which the jury find the facts only, leaving the judgment to the court. It must present the conclusions of fact as established by the evidence, and not the evidence to prove them, and these conclusions of fact must be so presented as that nothing remains to the court but to draw conclusions of law upon them." (§ 1152; the operative language of Code Civ. Proc., § 624 is identical.) Such special verdicts "must, . . . find the facts expressly and specially and not generally or impliedly. [They] must present the facts so distinctly as to refer the Court clearly to the questions of law arising upon them . . . ." (*Breeze* v. *Doyle* (1861) 19 Cal. 101, 105.) They must "pass on *all* the issues by presenting the conclusions of fact bearing on *all*" (*In re Sanderson* (1887) 74 Cal. 199, 208 [15 P. 753] (italics supplied)) and "should include all questions of fact raised by the pleadings and necessary to determine the cause." (*People* v. *Rhone* (1968) 267 Cal.App.2d 652, 660 [73 Cal.Rptr. 463].)

Appellant claims that the verdict returned on the special circumstance fails to comply with these requirements, because it contains no reference to two of the essential elements required by section 190.2, subdivision (a)(18): that the murder was intentional and that the victim experienced extreme physical pain. Section 190.4, however, does not direct the jury to return a special

verdict, as a comparison of the language of that section with the language of sections 1150-1152 demonstrates.

Section 1150 requires the jury in a criminal case to render a general verdict, "except that in a superior court, when they are in doubt as to the legal effect of the facts proved, they may, except upon a trial for libel, find a special verdict." Section 1152 defines a special verdict as "that by which the jury find the facts only, leaving the judgment to the court. It must present the conclusions of fact as established by the evidence, and not the evidence to prove them, and these conclusions of fact must be so presented as that nothing remains to the Court but to draw conclusions of law upon them." It has been held that a court may upon the request of either party direct the jury that they have discretion to bring in a special verdict provided it makes clear that such findings are within the jury's absolute discretion. (*People* v. *Mardian* (1975) 47 Cal.App.3d 16 [121 Cal.Rptr. 269].) Such verdicts have been used to ensure that a jury makes the proper unanimous finding required to sustain a conspiracy conviction (*People* v. *Bratis* (1977) 73 Cal.App.3d 751 [141 Cal.Rptr. 45]) and may be used to establish aggravated offenses or enhanced punishment. (See, *People* v. *Beamon* (1973) 8 Cal.3d 625, 629, fn. 2 [105 Cal.Rptr. 681, 504 P.2d 905].) A special *verdict* in short presents conclusions of fact and leaves to the court the task of drawing conclusions of law and rendering judgment upon them where the jury is unable to do so. (§§ 1150, 1152.)

In a capital case tried before a jury, however, it is the jury's function to reach a conclusion as to whether or not the charged special circumstance is true by applying legal principles on which they are instructed to the evidence presented to them. (§ 190.4.) If there is a reasonable doubt as to its truth, "the defendant is entitled to a finding that it is not true." (*Ibid.*) If the jury is unable to reach a unanimous verdict either that one of the special circumstances is true or that none of them are true, the court is directed to dismiss that jury and impanel another to try the issue of special circumstances. If the second jury is similarly unable to reach a verdict, the court may impanel a third, or try the issue itself, or effectively strike the special circumstance (by sentencing the defendant to the term for first degree murder without special circumstances). (*Ibid.*) Thus, section 190.4 does not contemplate that a jury will return the kind of special verdict provided in section 1152.

The evident purpose of section 190.4, subdivision (a) is to require the jury to make a special *finding* "on the truth of *each* alleged special circumstance" which is separate from their verdict of first degree murder. (Italics supplied.) Because more than one special circumstance may be charged, but a unanimous finding of guilt on one of them is required before the offense

becomes a capital crime, particularized verdicts on each special circumstance are essential. But the statutory purpose is served by what the statutory language calls for: a finding of the *truth* or lack of truth of each circumstance, not of the facts upon which that finding is based. The statute does not employ the terminology or serve the purpose of the special verdict statutes.

## PENALTY PHASE EVIDENCE

At the penalty phase the prosecution offered as evidence in aggravation testimony regarding two instances of prior criminal activity by appellant which involved the use of force and violence.

Susan T. testified that one night in 1974 she was awakened as she slept on her couch by a man who crouched over her and stabbed her repeatedly in the throat, face, eye and arms. When she realized the attack was not simply a bad dream, she began to fight. The assailant's knife severed her jugular vein. As blood spurted from her neck, she kneed the attacker in the groin and he fled. She managed to walk outside, where a neighbor administered emergency aid and called an ambulance. Ms. T. had suffered 20 to 23 stabbing wounds, including severe wounds to one eye and was hospitalized for three to four weeks.

The light from a lamp and from the television which were on enabled Ms. T. to see her attacker's face and the clothes he was wearing. She testified that throughout the assault her assailant was smiling. She identified him at a preliminary hearing and subsequently learned that his name was appellant's.[9]

James B. testified that in December 1980 he was assaulted by a group of prisoners in the holding tank of the Orange County jail. He was beaten and forced to submit to their demands that he orally copulate each of them. B. testified that appellant was one of those whom he was forced to copulate. Appellant then took down B.'s pants and attempted, unsuccessfully, to sodomize him. B. denied that appellant had hit him during the incident but testified that "he seemed to be a pretty nice guy most of the time."

John F., who had provided important testimony of appellant's admissions at the guilt phase of the trial, testified to additional details of the sexual

---

[9]The record shows that as a result of this incident appellant was convicted of first degree burglary and assault with a deadly weapon with findings of use of a deadly weapon and infliction of great bodily injury. He was sentenced to a prison term of 15 years to life on April 16, 1975. This evidence of conviction was not presented to the jury, but the fact appellant had previously been imprisoned was brought out in the testimony of defense witnesses. The prosecutor referred to the fact of a prior conviction in his argument.

assault of B. F.'s testimony, unlike B.'s, portrayed appellant as the instigator of the incident. F. testified that appellant alone attacked and dragged B. into the cell's bathroom where he forced B. to perform oral copulation and then sodomized B. who protested loudly. Other prisoners then forced B. to engage in oral copulation. According to F. appellant's face wore a look of total desperation during the act of sodomy.[10]

Appellant presented as evidence in mitigation the testimony of his stepfather and three social workers who had known his family and had witnessed the difficult circumstances of his childhood and adolescence. The picture drawn by the witnesses is of an isolated and disturbed young man who tried to maintain the outward appearance of happiness while struggling with the conflicts created by an unusually difficult family situation.

Appellant's mother was described as sexually promiscuous, neglectful of her six children and suffering from alcohol-related problems. She married nine times and had additional extramarital affairs. The children were placed in temporary foster care on a number of occasions when social workers found them alone and uncared for.

Appellant was apparently the "misfit" of the family who was subjected to verbal abuse by everyone and physical abuse by one uncle. Appellant was not able to win approval from his mother, even though he did well in school and earned straight A's in his classes. There was evidence that appellant was aware—at times painfully—of his mother's sexual activities.

Social workers who talked with appellant about his role in the family believed appellant suffered deep conflict between his feelings of love and anger at his mother. They felt appellant exhibited a degree of desperation in his need to please his peers and that others played on that need by goading him into mischief for their own purpose.

While on probation for a juvenile petty theft offense appellant left Utah without permission to live in Reno, Nevada with an uncle. At the urging of his probation officer, he was granted permission to complete probation in Nevada, where his uncle would provide him with employment and an adequate living situation.

---

[10]Appellant's objections that F.'s testimony was cumulative and more prejudicial than probative (Evid. Code, § 352) were overruled on the theory that F. was better able than B. to see how many people were involved in the assault. The district attorney argued also that B. was reluctant to admit the degree of force used by appellant and to admit that appellant had achieved penetration during the sodomy for a variety of reasons, possibly including fear of appellant and embarrassment at a perceived loss of manhood. The record of his testimony supports the contention that B. was reluctant to testify about acts of violence by appellant and about the sodomy but does not reveal the reason.

When he was 17 appellant joined the Marine Corps. After basic training he visited Utah and impressed his former social service workers with how well and happy he seemed. But his stepfather saw appellant in a moment of anguish which indicated to him that the family situation had not been completely resolved.

The prosecution's penalty argument stressed the aggravation inherent in the circumstances of this killing and the other incidents of criminal activity involving force and violence. The district attorney characterized appellant as a "human predator" who would be as dangerous inside the walls of a prison as he had been outside, and belittled the evidence of appellant's unfortunate background which had been offered in mitigation. To the contrary the prosecutor suggested that the three social workers who had demonstrated an interest in appellant's welfare had provided a more than adequate opportunity and incentive for appellant to overcome his familial difficulties and that the testimony showed appellant had overcome the negative impact of his childhood circumstances while in the Marine Corps. The district attorney suggested that the defense's attempt to evoke sympathy was really an attempt to keep the jury from following the requirements of the law. He argued that evidence of appellant's background could be considered a mitigating circumstance only if it had some relationship to the crime of which he was convicted.

The prosecutor stressed that the statute reposes the decision as to penalty with the jury. He explained that the statute directs the jury to determine penalty according to the result of the weighing of statutorily enumerated aggravating circumstances against mitigating ones, and that it does not require the jury to find that aggravation outweighs mitigation beyond a reasonable doubt in order to return a verdict of death. The prosecutor acknowledged that the statute permits the jury to determine whether the factors are aggravating or mitigating and to determine what weight should be given to each factor when deciding the penalty to be imposed.

The district attorney then devoted a major portion of his argument to an item by item application of the statutory aggravating and mitigating factors (§ 190.3) to the evidence in the case. From each of the potentially mitigating factors of which there was no evidence[11] the district attorney found a basis

[11]These were the factors in section 190.3, subdivisions (d) defendant acted under influence of extreme mental or emotional disturbance; (e) victim was participant in homicidal conduct; (f) defendant reasonably believed there was some moral justification or extenuation of his conduct; (g) defendant acted under extreme duress or substantial domination of another person; (h) defendant suffered impaired capacity to appreciate criminality or to conform conduct to law due to mental disease or defect or intoxication; (i) age of defendant; and (j) whether defendant was accomplice or minor participant.

to argue additional aggravation. The lack of evidence that appellant acted under the influence of an extreme mental or emotional disturbance (subd. (d)), or acted in submission to the will of another person (subd. (g)), or that his capacity to appreciate the criminality of his act or conform his conduct to the law was impaired by alcohol (subd. (h)) all demonstrated that appellant acted calmly, deliberately and of his own free will in the view of the district attorney. The lack of any reasonable belief in moral justification (subd. (f)) made the crime aggravated. And the fact that appellant was himself the perpetrator (subd. (j)) constituted yet another factor in aggravation to the prosecutor.

Although the trial court had ruled that the "Briggs Instruction" on the Governor's power to commute a sentence of life without possibility of parole violated the defendant's right to due process of law and would not be given, the prosecutor informed the jury that the Governor has the power to modify *any* sentence they might impose. He then asked them not to consider that fact in their deliberations. But in the course of arguing that death was appropriate because appellant's history of violence prior to and after the killing of Lingle demonstrated he was likely to remain dangerous in the future, the prosecutor raised the possibility of future release: "If you make a decision without possibility of parole, you know, there are other victims that are going to have to pay for that decision. [¶] I mean, there are people that have nothing to do with this decision now, that have no ability to make any input. They might be in prison. They might be on the—it might be somebody in Costa Mesa."

At the close of the district attorney's argument appellant's counsel moved for a new trial because of prosecutorial misconduct in mentioning the Governor's power of commutation and arguing appellant's future dangerousness. Although the court expressed dismay that the prosecutor had mentioned the commutation power after the court ruled the "Briggs Instruction" would not be given, it denied the motion. Instead the court admonished the jury to disregard the district attorney's comments about the Governor's powers and stressed that the instructions which would guide their deliberations contained no mention of such powers.

Appellant's counsel urged the members of the jury to use their reason and their hearts to show mercy for a fellow human being who was not strong enough to overcome the adversities of his early life. He acknowledged that none of appellant's evidence in any way excused the crimes of which he had been convicted, but suggested it might explain how they had come to pass. He read poetry from The Prophet by Gibran and from Shakespeare, and asked the jury to give appellant the lesser penalty of life imprisonment without the possibility of parole.

The court instructed the jury in accord with CALJIC 8.84.1 (1978 revision)[12] and 8.84.2 as modified by removal of that portion which informs the jury of the Governor's power to commute a sentence of life without possibility of parole to a life sentence.[13]

## IV

Appellant was tried in 1981, prior to several important judicial decisions clarifying the penalty phase procedures which are critical to the constitutional validity of California's capital sentencing scheme. We conclude that the holdings of three of the intervening decisions and the federal precedents

---

[12]CALJIC Nos. 8.84.1 (1978 rev.) provides:

"In determining which penalty is to be imposed on defendant you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offenses and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

[13]CALJIC No. 8.84.2 as modified provides:

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on [each] defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole.

"You shall now retire and select one of your number to act as foreman, who will preside over your deliberations. In order to make a determination as to the penalty, all twelve jurors must agree.

"Any verdict that you reach must be dated and signed by your foreman on a form that will be provided and then you shall return with it to this courtroom."

upon which two of them are based compel reversal of appellant's death sentence. The penalty phase instructions erroneously failed to inform appellant's jury of the standard of proof required before certain important evidence in aggravation of penalty might properly be considered (*People* v. *Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279] (plur. opn.) and 60 (conc. opn. of Justice Broussard)); failed to inform the jury of its discretion to consider any element of defendant's background or character as a factor in mitigation of penalty—an instructional error which was compounded by the prosecutor's closing argument—(*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989, 98 S.Ct. 2954]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813]); and misled the jury by failing to make clear that the "weighing" of aggravating against mitigating circumstances is not a mechanical or numerical process, but rather entails the jury's responsibility for determining the appropriate punishment based upon all relevant evidence (*People* v. *Brown, supra,* 40 Cal.3d 512, 542).

After examining the record of appellant's trial, the totality of the instructions given and the nature of the arguments made to the jury, we conclude that these errors may have misled the jury as to its proper function and that there is therefore a reasonable possibility the errors affected the penalty verdict. (See, *People* v. *Robertson, supra,* 33 Cal.3d 21, 63 (conc. opn. of Justice Broussard); *People* v. *Easley, supra,* 34 Cal.3d 858, 879; *People* v. *Brown, supra,* 40 Cal.3d 512, 545, fn. 17.) Accordingly, we reverse the judgment of death and remand the matter for new penalty proceedings. For guidance of the trial court on retrial of the penalty phase, we address appellant's additional contentions of prosecutorial misconduct.

A. *Failure to Instruct that Other Crimes Must be Proved Beyond a Reasonable Doubt*

In *People* v. *Robertson, supra,* 33 Cal.3d 21 this court reaffirmed the line of authority which holds that at the penalty phase of a capital trial a defendant is entitled to an instruction to the effect that the jury may consider evidence of other crimes which are introduced or referred to as aggravating factors pursuant to section 190.3, subdivision (b) only when the commission of the other crimes is proved beyond a reasonable doubt. (33 Cal.3d at pp. 53 (plur. opn.) and 60 (conc. opn. of Broussard, J.).) Although the evidence in aggravation consisted of testimony that appellant had committed two violent crimes in addition to the killing of which he was convicted in the present proceeding, the instruction mandated by *Robertson* was not given. The failure to give the instruction was error.

We recognized in *Robertson* that the potential for prejudice from the failure to give a reasonable doubt instruction as to other crimes is especially

serious because that type of evidence "'may have a particularly damaging impact on the jury's determination whether the defendant should be executed.' (*People* v. *Polk* [(1975)] 63 Cal.2d [443] at p. 450 [47 Cal.Rptr. 1, 406 P.2d 641].)" (33 Cal.3d at p. 54.)

This evidence of other crimes was the only evidence beyond the facts of the killing of Lingle which was offered in aggravation of penalty. The incident involving Susan T. bore significant similarities to the present crime in its extremely violent nature and in the method of the attack on the female victim.

The testimony regarding the sexual assault of James B. was inconsistent and contradictory as to the amount of force used by appellant, the degree to which appellant initiated the assaultive activity and whether sodomy was achieved or only attempted. Nevertheless, the district attorney emphasized that the James B. incident demonstrated appellant's continued dangerousness even as a life prisoner and thus it formed an important part of his argument that death was a more appropriate penalty than life imprisonment without possibility of parole. The evidence of other crimes was highly damaging to appellant.

### 1. *Failure to Instruct on the Elements of the Other Crimes*

■ Appellant argues that a logical and legal corollary of the rule that a reasonable doubt instruction must be given is a rule that the jury must be instructed on the elements of the alleged other crimes. Such a rule has been established in other jurisdictions. (E.g., *Burger* v. *State* (1980) 245 Ga. 458 [265 S.E.2d 796]; *State* v. *Moore* (Tenn. 1981) 614 S.W.2d 348, 351.)

This argument was rejected by this court in *People* v. *Tahl* (1967) 65 Cal.2d 719, 736-738 [56 Cal.Rptr. 318, 423 P.2d 246], where we considered an earlier capital punishment scheme. (See also, *People* v. *Nye* (1969) 71 Cal.2d 356, 367 [78 Cal.Rptr. 467, 455 P.2d 395].) However, *Tahl* and *Nye* stand only for the proposition that a trial court has no sua sponte duty to instruct the jury as to the elements of all of the other crimes that have been introduced at the penalty phase. We recognize that a defendant, for tactical reasons, may not want the penalty phase instructions overloaded with a series of lengthy instructions on the elements of alleged other crimes because he may fear that such instructions could lead the jury to place undue emphasis on the other crimes rather than on the central question of whether he should live or die. (*People* v. *Phillips* (1985) *ante,* pp. 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].)

As we explained in *Phillips,* the cases do not prohibit a trial court from instructing on the elements of other crimes offered as aggravating factors in

an appropriate case where either the defendant or the prosecution requests such instruction or the court itself determines such instruction is vital to a proper consideration of the evidence. (*Ibid*; cf. *People* v. *Robertson, supra,* 33 Cal.3d at p. 53.) Normally, a defendant's failure to request instruction on the elements of the other-crimes aggravating evidence will preclude him from raising the issue on appeal (*People* v. *Phillips, supra, ante,* at p. 72, fn. 25) and appellant's claim is thus not properly before us. On retrial of the penalty phase, however, he may wish to request such instruction or rely upon the trial court's preliminary determination that there is substantial evidence to prove each element of the alleged other crimes. (See *People* v. *Phillips, supra, ante,* at p. 72; Evid. Code, §§ 310, 402.)

B. *CALJIC Nos. 8.84.1 and 8.84.2 misled the jury regarding the scope of mitigating evidence it might properly consider and the nature of balancing process to be applied to the ultimate decision to fix the penalty at death or life without possibility of parole.*

The district attorney argued that evidence of appellant's background could be considered as a circumstance mitigating penalty only if it bore some relationship to the crime of which he was convicted. Appellant's argument for imposition of life without parole rather than the death penalty consisted entirely of an appeal for sympathy based on the unhappy circumstances of his upbringing.

The court instructed the jury in the language of CALJIC No. 8.84.1, subdivision (k) that they could consider "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The court also instructed according to CALJIC No. 8.84.2, modified to delete reference to the governor's power of commutation. CALJIC No. 8.84.2, tracking the language of section 190.3, directed: "[Y]ou shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

In *People* v. *Easley, supra,* 34 Cal.3d 858, this court noted that the wording of 8.84.1 is potentially confusing. "CALJIC 8.84.1—while listing a variety of aggravating and mitigating factors—does not explicitly inform the jury that it may consider *any* mitigating factor proffered by the defendant. . . . [A] jury . . . could reasonably construe the instruction's

language to permit consideration only of circumstances that relate to the 'gravity *of the crime*' and not of circumstances that relate to the general character, family background or other aspects *of the defendant.*" (*Id.,* at p. 878, fn. omitted, italics in orig.)

This limitation on the jury's consideration of evidence in mitigation of penalty in a capital case contravenes the mandate of the federal Constitution. In *Lockett* v. *Ohio, supra,* 438 U.S. 586, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death . . . . [¶] . . . [A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." (*Id.,* at pp. 604, 605 [57 L.Ed.2d at pp. 989-990], italics in original, fns. omitted.)

The high court reaffirmed this holding in *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869]. In *Eddings,* a death judgment was reversed because the trial judge understood the statute to preclude him from considering the accused's mitigating evidence. The *Eddings* court explained, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer . . . may determine the weight to be given relevant evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." (*Id.,* at pp. 113-114, italics deleted, fn. omitted; see also *Barclay* v. *Florida* (1983) 463 U.S. 939, 946, fn. 2, [77 L.Ed.2d 1134, 1142, 103 S.Ct. 3418, 3430] (conc. opn. of Stevens, J.).)

This court, too, has made clear that a constitutional death penalty scheme must direct the jury to "'weigh the sympathetic elements of defendant's background against those that may offend the conscience.'" (*People* v. *Robertson, supra,* 33 Cal.3d 21, 58, quoting *People* v. *Haskett* (1982) 30 Cal.3d 841, 843 [180 Cal.Rptr. 640, 640 P.2d 776].)

Clearly, if the jury must be permitted to give independent mitigating weight to any evidence of character or background on which an accused bases his plea for a life sentence, the jury must be so informed. The commands of *Lockett* and *Eddings* are not satisfied if mitigating evidence is admitted without proper instructions as to how to weigh that evidence.

*Easley* therefore ordered a prospective cure for the instruction's deficiency (34 Cal.3d at p. 878). "In order to avoid potential misunderstanding in the future, trial courts—in instructing on the factor embodied in section 190.3, subdivision (k)—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' [Citation.]" (*Ibid.,* fn. 10.)[14]

In *Easley* the misleading "factor (k)" instruction was given in conjunction with an instruction specifically directing the penalty jury to disregard pity or sympathy for the defendant. (CALJIC No. 1.00; 4th ed. 1979.) The latter instruction was treated as the more significant error. (34 Cal.3d at pp. 876-879; see also *People* v. *Lanphear* (1984) 36 Cal.3d 163 [203 Cal.Rptr. 122, 680 P.2d 1081], a case which arose under the 1977 death penalty statute.)

CALJIC No. 1.00 was not given at the penalty phase of appellant's trial. However, the court's silence on the subject of sympathy does not satisfy the constitutional requirements set forth in *Lockett, supra,* and *Eddings, supra.* The standard instruction in CALJIC No. 8.84.2 (4th ed. 1979) by telling the jurors to be guided by the factors enumerated in 8.84.1, created a strong inference that the statutory list was an exclusive one. The jury might reasonably have concluded that the relevance of appellant's proffered evidence in mitigation was limited by the unduly narrow factor (k). The prosecutor in fact argued—erroneously, in light of *Lockett* and *Eddings*— that the circumstances of appellant's background could be considered mitigating factors only if they related to the crime itself. The standard instructions given by the court did nothing to correct the misimpression thus created; instead they reinforced it. Appellant's entire penalty phase effort was, however, to evoke sympathy for himself by presenting to the jurors evidence that he was not only deprived of basic familial love and support but was in fact raised in a physically and emotionally abusive setting. Thus, the *Easley* error in 8.84.1 alone may have had a significant impact on the jury's penalty determination.

■■■ The error was compounded in this case by the related instruction closely following the language of section 190.3. (CALJIC No. 8.84.2 as modified.)

Section 190.3 provides in pertinent part that "After having heard and received all of the evidence, and after having heard and considered the

---

[14]The CALJIC Committee has since responded, by redrafting the "factor (k)" instruction to incorporate this language. (See CALJIC No. 8.84.1, subd. (k) (4th ed. 1984 rev.).)

arguments of counsel, the trier of fact *shall* consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and *shall* impose a sentence of death if the trier of fact concludes that the aggravating circumstances *outweigh* the mitigating circumstances.'' (Italics added.)

In *People* v. *Brown, supra,* 40 Cal.3d 512 this court upheld the validity of section 190.3. The court rejected defendant's arguments that this statute "impermissibly restricts the jury's constitutional sentencing discretion" by restricting consideration of sympathetic evidence of defendant's background and character which is unconnected to the charged crimes (*Easley* error) and by confining the jury to a mechanical balancing of aggravating and mitigating factors, stripping the jury of its constitutional power to conclude that the totality of constitutionally relevant circumstances does not warrant the death penalty. (*Brown, supra,* at p. 540.) The court agreed that "a statute would be invalid if interpreted to preclude juror consideration of any factors constitutionally relevant to imposition of the death penalty. Nor would a statute pass muster if it required jurors to render a death verdict on the basis of some arithmetical formula, or if it forced them to impose death on any basis other than their own judgment that such a verdict was appropriate under all the facts and circumstances of the individual case.'' (*Id.,* at p. 541, fn. omitted.) But the court determined that section 190.3 "need not, and should not, be so interpreted." (*Id.,* at p. 541).

Pointing to this court's prior decisions in *People* v. *Frierson* (1979) 25 Cal.3d 142, 178 [158 Cal.Rptr. 281, 599 P.2d 587], *People* v. *Easley, supra,* 34 Cal.3d at p. 878, and the decision of the United States Supreme Court in *Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 989], *Brown* explained that section 190.3, subdivision (k) had previously been found susceptible to the expansion and clarification required by *Easley* and discussed in this opinion at pages 282-284, *ante.* The *Brown* court then determined that the statutory reference to "weighing" and the use of the word "shall" "need not be interpreted to limit impermissibly the scope of the jury's ultimate discretion. In this context, the word 'weighing' is a metaphor for a process which by nature is incapable of precise description. The word connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider, including factor 'k' as we have interpreted it. By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should not be understood to require any juror

to vote for the death penalty unless upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all of the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (*Brown, supra,* at p. 542.) The *Brown* decision emphasized that mitigating evidence at a capital trial need not necessarily be capable of redeeming the offender or excusing his conduct in the abstract. Rather, we explained, the weighing of aggravating and mitigating circumstances must occur within the context of the two permissible punishments: life without possibility of parole and death. "[T]he balance is not between good and bad but between life and death." (*Id.,* at p. 542, fn. 13.)

While *Brown* held that section 190.3 "is not invalid on grounds that it withdraws constitutionally compelled sentencing discretion from the jury," (*id.,* at p. 545) the decision acknowledged that "the language of the statute, and in particular the words 'shall impose a sentence of death,' leave room for some confusion as to the jury's role." (*Id.,* at p. 545, fn. 17.) Therefore, the court suggested that trial courts in future death penalty trials should "instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in [the *Brown*] opinion." (*Ibid.*) And the opinion declined to pass judgment upon the validity of verdicts previously rendered without benefit of the clarifying instructions thereafter required, but explained that "[e]ach such prior case must be examined on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Ibid.*)

### C. *Prejudice from Instructional Error*

 Our examination of the record of appellant's trial, the totality of the penalty instructions given and the nature of the arguments made to the jury leads us to conclude that in this case the jury may have been misled as to its proper function.

First, we note that the three instructional errors were especially important here because the instructions affected the juror's consideration of the only significant evidence in aggravation and mitigation of penalty, as well as the jury's understanding of the nature of the balancing process by which it was to determine whether appellant deserved the punishment of death or life without parole. The *Robertson* errors permitted the jury to consider evidence of other crimes as circumstances in aggravation without finding—as required by law—that the evidence established beyond a reasonable doubt that appellant committed those crimes. At the same time the pre-*Easley* "factor k" instruction failed to inform the jury that it could properly con-

sider as a circumstance in mitigation the only evidence offered by appellant for that purpose at the penalty trial. The combined effect of these instructions is that the jury may have improperly found aggravating circumstances and improperly failed to find mitigating circumstances.

There were no supplementary instructions, such as those suggested in *Easley, supra,* 34 Cal.3d 858, which would have clarified the jury's discretion to consider mitigating evidence unrelated to the crime itself. And the prosecutor's argument reinforced the error by taking advantage of the ambiguity in the "factor k" instruction. He urged the jury to discount appellant's mitigating evidence as "just something that is an attempt to get you to feel some sympathy, to get you to feel sorry for the defendant." Instead, the prosecutor argued, "I submit to you that, you know, in order to find it to be a mitigating circumstance, you have got to find, somehow, that it is something, it has something to do with the crime because [factor k] asks you to, a circumstance that extenuates the gravity of the crime. . . ."

In light of the absence of clarifying instructions on the subject of mitigating evidence and the nature of the balancing process, it is likely that the jury was misled as to the scope of its sentencing discretion under applicable statutory and constitutional principles and there is a reasonable possibility the penalty verdict was affected. The judgment of death must be reversed.

D. *Prosecutorial Misconduct in Closing Argument*

1. *Reference to Governor's Power of Commutation*

Prior to argument at the penalty phase the trial court ruled that it would, pursuant to appellant's request and with the prosecutor's acquiescence, modify CALJIC No. 8.84.2 by removing the portion of the instruction informing the jury of the Governor's power to commute a sentence of life without parole (the "Briggs Instruction"). In spite of this ruling the prosecutor discussed the commutation power in his closing statement. His argument that appellant might in the future present a danger to people "in Costa Mesa" emphasized the significance of the information.

This court has ruled that the "Briggs Instruction" violates the guarantee of a fundamentally fair decision-making process which is embodied in article I, section 7 and article I, section 15 of the California Constitution. (*People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos II*).) "[T]he Briggs Instruction is incompatible with this guarantee of 'fundamental fairness' both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations." (37 Cal.3d at p. 153.)

 The prosecutor's argument was improper under *Ramos II*. The fact that he referred to the power to commute both a sentence of life without parole and one of death does not cure the harm from the presentation of improper information. (*People* v. *Ramos, supra,* 37 Cal.3d at p. 155.) The argument was also improper in light of the trial court's ruling that the "Briggs Instruction" would not be given based upon constitutional objections by appellant. A prosecutor may not, under the guise of argument, assert as factual matters excluded from evidence because inadmissible. (*People* v. *Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33].)

### 2. *Comments on Future Dangerousness*

 In *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446] this court held it reversible error to admit at the penalty phase of a capital case expert psychiatric testimony predicting continued violent conduct by the defendant. We explained that such predictions are unreliable and frequently erroneous, have little relevance to any of the factors considered by the jury in deciding to impose the death penalty and are—despite their unreliability—potentially extremely prejudicial to the defendant. Such predictions should therefore be excluded pursuant to Evidence Code section 352 as a general rule.

 Appellant urges as a corollary to *Murtishaw*'s holding that the prosecutor's comments on future dangerousness were evidentially unfounded and improper. (See *People* v. *Love, supra,* 56 Cal.2d 720.) We find, however, that the prosecutor's comments in this case were within the proper bounds of argument to the jury.

Permitting open and far-ranging argument at the penalty phase does not offend the United States Constitution. (*Gregg* v. *Georgia, supra,* 428 U.S. 153, 203-204 [49 L.Ed.2d 859, 891].) Indeed, a state statute requiring the jury to determine the probability of future criminal conduct at the penalty phase has withstood constitutional scrutiny. (*Jurek* v. *Texas* (1976) 428 U.S. 262, 275 [49 L.Ed.2d 929, 940, 96 S.Ct. 2950].) The prosecutor's comments were not based upon inadmissible evidence of expert testimony predicting future dangerousness. It is the potential for prejudice from the testimony of an "established and credentialed expert" that a defendant may or will commit future violent acts which we held in *Murtishaw* outweighed such comments' arguable relevance to the question of aggravation. (29 Cal.3d at p. 773.)

### 3. *Improper Argument That Lack of Mitigating Evidence Rendered Crime Aggravated*

 As noted above the prosecutor argued that the absence of certain potential mitigating factors (§ 190.3, subds. (d), (g) and (h)) showed that

appellant acted calmly, deliberately and of his own free will when he committed the murder. The lack of mitigating evidence pertaining to these factors thus rendered each of them an aggravating factor in appellant's case. Appellant claims this argument misconstrued section 190.3 and unfairly tilted the jury toward a verdict of death.

Section 190.3 provides that in determining the penalty the trier of fact "shall take into account" any of the 11 enumerated factors "if relevant." The section further provides that after hearing all of the evidence and the arguments of counsel, "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."

The statute does not designate any of the factors as aggravating or mitigating. The "whether-or-not" and "presence-or-absence" phrase used in eight of the subdivisions suggests there might be either a presence or an absence of the factors. However, the statutory instruction that the trier of fact consider the factors "if relevant" seems to contemplate that not all factors will be relevant in all cases and further that a factor which is not relevant to the evidence in a particular case should be disregarded.

As appellant argues, "aggravation" is by definition a circumstance above and beyond the essential constituents of a crime which increases its guilt or enormity or adds to its injurious consequences. (Citing to Black's Law Dict. (4th rev. ed. 1968).) Mitigating circumstances, on the other hand, are ones which although not constituting an excuse for or justification of the crime, may be considered as extenuating or reducing the degree of moral culpability. (*Id.*) Thus, the absence of mitigation would not automatically render the crime more offensive than any other murder of the same general character.

Several of the statutory mitigating factors are particularly unlikely to be present in a given case. (See, especially, § 190.3, subds. (e) [whether or not the victim was a participant in the homicidal conduct or consented to it]; and (f) [whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct].) To permit consideration of the absence of these factors as aggravating circumstances would make these aggravating circumstances automatically applicable to most murders.

We conclude that the form of the prosecutor's argument is likely to confuse the jury as to the meaning of "aggravation" and "mitigation" under the statute and is therefore improper under section 190.3. It should not in the future be permitted.

## CONCLUSION

For the reasons we have explained, we conclude that the torture-murder special circumstance of the 1978 law is capable of a construction which is consistent with the language and purpose of the statute and with the demands of the United States and California Constitutions. The trial court in this case properly instructed the jury which found appellant guilty of first degree murder and found the special circumstance to be true.

The judgment of conviction is affirmed. However, the instructions at the penalty phase were in error under the decisions of *People* v. *Robertson, supra,* 33 Cal.3d 21, *People* v. *Easley, supra,* 34 Cal.3d 858 and *Lockett* v. *Ohio, supra,* 438 U.S. 536, and *People* v. *Brown, supra,* 40 Cal.3d 512. On this record the errors may have misled the jury as to its proper function and there is, therefore, a reasonable possibility that the penalty verdict was affected. Accordingly, the sentence of death is reversed and the cause is remanded for a new penalty trial consistent with the views expressed herein.

Grodin, J., and Kaus, J.,* concurred.

**BIRD, C. J.**—I write because I am troubled by the increasing tendency of this court to rewrite unconstitutional or improperly drafted statutes.

In 1977, the Legislature enacted a death penalty statute making murder which involved the infliction of torture a capital offense. (Former Pen. Code, § 190.2, subd. (c)(4); Stats. 1977, ch. 316, § 9, p. 1258.[1]) Under that statute, the prosecution was required to prove that (1) the murder was willful, deliberate, and premeditated; (2) the accused physically aided or

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]That statute defined a special circumstance where "[t]he defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such acts causing death and . . . [t]he murder was willful, deliberate, and premeditated, and involved the infliction of torture. For purposes of this section, torture requires proof of an intent to inflict extreme and prolonged pain."

All further statutory references are to the Penal Code.

committed the death-causing act; and (3) he intended to inflict prolonged and extreme pain.[2]

The 1978 Briggs Initiative made several important changes to the torture special circumstance statute. Under that law, any intentional murder which involved the infliction of torture is a capital offense. Torture now "requires proof of the infliction of extreme physical pain no matter how long its duration." (§ 190.2, subd. (a)(18).)

As is apparent, the 1978 statute no longer requires that the murder be willful, deliberate, and premeditated, nor that the accused have an intent to inflict pain. The "prolonged pain" requirement has been eliminated.

In short, all that the present torture special circumstance requires is an intentional murder in which extreme physical pain, regardless of duration, is inflicted. As written, the special circumstance is capable of application to virtually any intentional first degree murder.

This court noted in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 151 [197 Cal.Rptr. 79, 672 P.2d 862] that "Decisions under the Eighth Amendment have established that a state cannot impose the death penalty for all murders [citations], nor give the jury uncontrolled discretion to select which defendants suffer that penalty [citation]. Instead, it must develop standards to guide the decision of the jury, *selecting from among the murder victims those aggravated cases in which the death penalty would be appropriate. 'A capital sentencing scheme must . . . provide a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.'"* (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 427 . . . .)" (Italics added.) As written, the present torture special circumstance fails to do that. Therefore, it violates Eighth Amendment standards.

The majority, like the Attorney General, recognize the substantial changes that section 190.2, subdivision (a)(18) made in the law. They also acknowledge its constitutional infirmity as written. (Majority opn., *ante,* at p. 266.) However, the majority decide to rewrite the section by engrafting onto the 1978 initiative two of the 1977 law's requirements: (1) an intent to torture

---

[2]First degree murder by torture (§ 189) requires a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain, but not a premeditated intent to kill. (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People* v. *Mattson* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193].) Any intentional act involving a high degree of probability of death, committed with a conscious disregard for human life, is sufficient for a conviction under this theory. (*Id.,* at pp. 182-183; see also *People* v. *Thomas* (1953) 41 Cal.2d 470, 474-475 [261 P.2d 1].) Awareness of pain by the victim is not required. (*People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881].)

the victim and (2) the infliction of "an extremely painful act upon a living victim." (Majority opn., *ante,* at p. 271.)

I question at what point such legislative drafting—performed under the guise of "statutory construction"—should be left to the people, acting either through the initiative process or through their legislative representatives. I also question the wisdom of construing, in piecemeal fashion, individual provisions of the 1978 law without an appreciation for the degree of judicial overhaul that has been required to ensure that the law passes constitutional muster.

So far, this court has construed three provisions of the 1978 Briggs Initiative to preserve their constitutionality. The first of these was the felony-murder special circumstance provisions of section 190.2, subdivisions (a)(17) and (b), which were the subject of this court's opinion in *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131. There, a majority of the court concluded that the 1978 initiative requires proof of an intent to kill or to aid in a killing as an element of the felony-murder special circumstance. (*Id.,* at p. 135; see also *id.,* at pp. 153-154.) The court reached that conclusion after a careful review of the "uncertain" language of the initiative and the ballot arguments which accompanied it, the confusing and inconsistent language of subdivisions (a)(17) and (b) of section 190.2, and the constitutional context in which the issue arose. In the end, the court concluded that nothing in the ballot arguments suggested that the framers intended to take the step of permitting infliction of the death penalty upon an accidental killer. (*Id.,* at p. 145.)

Recently, in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], a majority of this court construed two other sections of the 1978 law: (1) the language in section 190.3, subdivision (k) which directs the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" and (2) the directive in section 190.3 that the jury "shall impose a sentence of death" if "the aggravating circumstances outweigh the mitigating circumstances."

As to the "factor k" language, the *Brown* majority held that that provision could be construed to permit the jury's consideration of "'any other "aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death."'" The court relied on *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], in which "we necessarily determined that the statutory language [was] susceptible to that clarification." (*Brown, supra,* 40 Cal.3d at p. 541.)

As to the "outweigh" and "shall" language, the majority held that "the word 'weighing' . . . connotes a mental balancing process, but certainly not

one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them. Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . ." (*Id.*, at p. 542.) Such a construction, the majority concluded, was "reinforced by examination of general language in the 1978 law" (*ibid.*) and "honor[ed] the plain language of section 190.3." (*Id.*, at p. 545.)[3]

This present exercise in judicial construction goes beyond what was done in *Brown* and *Carlos*. What is required here is far more than the rectification of a "drafting" error or a clarification of "ambiguous" language. Some—though not all—of the elements eliminated from the 1977 version of the torture-murder special circumstance statute have simply been revived, under the principle that it is our duty to give statutes a constitutional construction "'rather than another [which is] in conflict with the Constitution.'" (Majority opn., *ante,* at p. 264, quoting *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669].)

Upholding the constitutionality of statutes is certainly a laudable goal of statutory construction.[4] However, at some point, "construction" becomes judicial overreaching of such proportions that it invades the province of our sister branch and improperly places us in the position of a legislative body. Since we are clearly powerless under the Constitution—not to mention far from equipped—to engage in the business of rewriting statutes, we must be careful to circumscribe the boundaries of that function.

Even the majority recognize that the duty to give a constitutional meaning to statutes arises only when it can fairly be said that the statute is *susceptible* of two constructions. (Majority opn., *ante,* at p. 264.) Here, there is no

---

[3]Another provision of the 1978 law which this court has construed—albeit not to save its constitutionality—is the kidnapping special circumstance statute. (§ 190.2, subd. (a)(17)(ii).) In *People* v. *Bigelow* (1984) 37 Cal.3d 731, 755-756 [209 Cal.Rptr. 328, 691 P.2d 994] this court construed the word "and" in that statute to mean "or" so as to permit proof of a murder occurring during either simple *or* aggravated kidnapping to subject an accused to the death penalty. (But see conc. & dis. opn. of Bird, C. J., 37 Cal.3d at pp. 760-761.) Noting that "the word 'and' is often carelessly used when 'or' is intended[,]" the majority adopted the reasoning advanced in *Talamantez* v. *Superior Court* (1981) 122 Cal.App.3d 629, 639 [176 Cal.Rptr. 800], to the effect that the two offenses were grouped together "'within one subsection because of their close relationship.'" (*Bigelow, supra,* 37 Cal.3d at p. 755; see also *People* v. *Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752] ["and" in insanity definition enacted by Proposition 8 (§ 25, subd. (b)) construed to mean "or" on the ground that the enacted language was an "inadvertent" "drafting error" which could "properly be rectified by judicial construction." (39 Cal.3d at p. 775; but see conc. & dis. opn. of Bird, C. J., *id.*, at p. 786)].)

[4]Indeed, I joined my colleagues in upholding the felony-murder special circumstance for precisely that reason in *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131.

way the 1978 torture special circumstance can be "construed" to embody an intent to inflict torture and the infliction of an extremely painful act upon a living victim, two of the requirements of the 1977 law. Nor is the majority's "construction" justified by any finding that the new statutory language is "ambiguous."

The separation of powers doctrine precludes us from correcting drafting errors on which the voters, wisely or unwisely, have put their stamp of approval. Instead, where clear statutory language is concerned, our duty is limited to measuring such language against guiding constitutional principles. We do not and cannot act as a superlegislature to cure every error of the Legislature or the drafters of initiatives. (Cf. *People* v. *Dillon* (1983) 34 Cal.3d 441, 463 [194 Cal.Rptr. 390, 668 P.2d 697].)

**MOSK, J.**—I concur in the views of the majority on torture-murder and therefore join in the affirmance on the judgment of guilt. I dissent from reversal of the penalty.

The other offenses admitted in evidence involved serious acts of violence and were therefore relevant as aggravating factors to be considered by the jury in assessing penalty. (See my dis. opn. in *People* v. *Robertson* (1982) 33 Cal.3d 21, 63 [188 Cal.Rptr. 77, 655 P.2d 77].) The other crimes need not be defined in instructions to the jury. After all, the jury should not become involved in extraneous *law*—i.e., legal definitions of prior crimes— but in the *fact* of violent conduct. Thus I find no error in the admission and consideration of other offenses.

Contrary to the majority holding, this case does not involve a *Ramos* (*People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]) error. *Ramos* was concerned with an instruction to the jury to consider the Governor's commutation power; no such instruction was given here. While the prosecutor's argument to the jury may have been suggestive of the commutation power, this error was cured by an appropriate admonition by the court to the jury, and by the usual instruction that counsels' arguments are not evidence and that only the court instructs on the applicable law.

I am not convinced that jurors are as naive as our opinions sometimes imply. In a capital case, the defense attorney attempts to stress the sympathetic factors that merit a verdict of life rather than death. Conversely the prosecutor attempts to stress the aggravating factors that justify forfeiting the defendant's life. As I wrote in my *Robertson* dissent (33 Cal.3d at p. 64), "there is no reason to believe the jurors were unable to recognize attorney hyperbole when heard in the heat of courtroom battle."

I would affirm the judgment in its entirety.

**BROUSSARD, J.**—I agree with the Chief Justice that the torture-murder special circumstance of the 1978 death penalty initiative (Pen. Code, § 190.2, subd. (a)(18)) cannot reasonably be construed to incorporate a requirement that the defendant intended to inflict torture. The drafters of the 1978 initiative deliberately removed the provision of the 1977 law requiring an intent to inflict torture. In an apparent attempt to draft a statute that would sweep in as many defendants as possible, they fashioned a special circumstance which by its terms applies to every intentional murder in which the victim suffers extreme physical pain, regardless of duration. Its language encompasses most murders in which the victim is not rendered instantly unconscious by the first shot or blow. Because the torture-murder special circumstance thus fails to single out those special, aggravated murders for which the death penalty can appropriately be imposed, it violates the Eighth Amendment to the United States Constitution. (See *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 151 [197 Cal.Rptr. 79, 672 P.2d 862].) We reach too far if, to save this enactment, we read back into the law provisions which were deliberately eliminated by the drafters. I would therefore hold that the torture-murder special circumstance of the 1978 law is unconstitutional, and would reverse the finding of special circumstances.

In order to bring about a majority decision of this appeal, I concur in the discussion of the dispositive penalty phase issues set out in the plurality opinion of Justice Reynoso. I agree that the penalty judgment was flawed by instructional error: the failure to instruct that uncharged crimes must be proved beyond a reasonable doubt; the failure to direct the jury to consider and weigh defendant's mitigating character and background evidence; the giving of an instruction which implied that jurors "shall" return a death verdict if aggravating circumstances outweigh mitigating circumstances even if they do not believe death is the appropriate penalty. I agree also that these errors, in combination, were prejudicial and require a new penalty trial. I take no position on the issues addressed in the plurality opinion to provide guidance on the retrial of the case.