CHIN, J.,
Concurring and Dissenting.—Although I concur in the judgment affirming defendant’s convictions, enhancements, and sentence, for reasons explained below, I do not agree that we should vacate the lying-in-wait special circumstance. Nor do I agree that the trial court erred in precluding defense counsel from making erroneous and inaccurate statements to the jury regarding a sentence of life without possibility of parole, i.e., that the sentence “means that you will never get out” and that defendant “will spend the rest of his life in a California maximum security prison.” I also do not subscribe to the majority’s suggestion that the approach of some federal authorities to harmless error review when the government fails to make a harmless error argument may be applicable to California appellate courts. The *448 parties have not briefed, or even mentioned, this question, no doubt because the majority’s suggestion is so clearly at odds with the California Constitution’s express commands regarding the review duty of California appellate courts.
1. Lying in Wait
One of the special circumstances the jury found true is that defendant “intentionally killed the victim by means of lying in wait.” (Pen. Code, § 190.2, subd. (a)(15).) Defendant argues that, for two reasons, we should set aside this finding: (1) the evidence to establish it is insufficient, and (2) the trial court prejudicially erred in failing to give, sua sponte, an instruction on evaluating circumstantial evidence. The majority vacates the finding based solely on the latter argument. In my view, neither argument has merit.
A. The Court Did Not Err in Failing to Give a Circumstantial Evidence Instruction.
Defendant argues the trial court prejudicially erred in failing to give, sua sponte, CALJIC No. 8.83 “and/or” CALJIC No. 8.83.1. CALJIC No. 8.83 (6th ed. 1996) states: “You are not permitted to find a special circumstance alleged in this case to be true based on circumstantial evidence unless the proved circumstance is not only (1) consistent with the theory that a special circumstance is true, but (2) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the truth of a special circumstance must be proved beyond a reasonable doubt. [¶] In other words, before an inference essential to establish a special circumstance may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which that inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the truth of a special circumstance and the other to its untruth, you must adopt the interpretation which points to its untruth, and reject the interpretation which points to its truth. [¶] If, on the other hand, one interpretation of that evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.”
CALJIC No. 8.83.1 (6th ed. 1996) is similar, but specifically addresses specific intent and mental states. It provides: “The [specific intent] [mental state] with which an act is done may be shown by the circumstances surrounding its commission. But you may not find a special circumstance alleged in this case to be true unless the proved surrounding circumstances are not only, (1) consistent with the theory that the defendant had the required *449 [specific intent] [mental state], but (2) cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to [any] [specific intent] [mental state] is susceptible of two reasonable interpretations, one of which points to the existence of the [specific intent] [or] [mental state] and the other to the absence of the [specific intent] [or] [mental state], you must adopt that interpretation which points to the absence of the [specific intent] [or] [mental state]. [¶] If, on the other hand, one interpretation of the evidence as to the [specific intent] [or] [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.” {Ibid.)
The federal Constitution does not require the giving of an instruction on evaluating circumstantial evidence where the trial court correctly instructs the jury on reasonable doubt. (People v. Livingston (2012) 53 Cal.4th 1145, 1167 [140 Cal.Rptr.3d 139, 274 P.3d 1132].) However, this court “has long held” that, under certain circumstances, ‘“trial courts must give ‘an instruction embodying the principle that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion.’ ” (Ibid.)
In this case, however, the court did not err in failing to give a circumstantial evidence instruction with respect to lying in wait because two of the circumstances that would have triggered its duty to give such an instruction were lacking. In her separate opinion, Justice Corrigan has explained why one of those circumstances is missing: Sergeant Richard Valdemar’s testimony, which is the circumstantial evidence the majority discusses, did not ‘“reasonably support[] an inference that defendant did not act with the required mental state.” (Dis. opn. of Corrigan, J., post, at p. 466.)
The other circumstance that was lacking was substantial reliance by the prosecution on the circumstantial evidence to prove defendant’s guilt. We have long and ‘“consistently” held that a trial court must give a circumstantial evidence instruction only when the prosecution “substantially relies on [such] evidence to prove its case.” (People v. Anderson (2001) 25 Cal.4th 543, 582 [106 Cal.Rptr.2d 575, 22 P.3d 347].) “Conversely, the instruction need not be given when circumstantial evidence is merely incidental to and corroborative of direct evidence . . . .” (People v. McKinnon (2011) 52 Cal.4th 610, 676 [130 Cal.Rptr.3d 590, 259 P.3d 1186] (McKinnon).) Indeed, where circumstantial evidence “is not the primary means by which the prosecution seeks to establish” its case, the instruction “should not be given” because it “may confuse and mislead” the jury. (Anderson, supra, at p. 582.) Under our decisions, this is true even if the circumstantial evidence is “substantial,” arguably “central” to the prosecution’s case, and “strong,” either in the *450 abstract or in comparison to the “quality of the direct evidence” that it “bolsters, corroborates, or supports.” (McKinnon, supra, at p. 676 & fn. 40.) It is also true even if the defendant’s mental state is at issue; a circumstantial evidence instruction is not required if that mental state is “proved by inference drawn from the direct evidence of [the] defendant’s conduct,” including the defendant’s own extrajudicial statements and the testimony of eyewitnesses. (People v. Wiley (1976) 18 Cal.3d 162, 175 [133 Cal.Rptr. 135, 554 P.2d 881].)
Under these principles, because the prosecution in this case primarily relied on direct evidence to prove the lying-in-wait special circumstance, the trial court did not err in failing to give, sua sponte, a circumstantial evidence instruction in connection with that special circumstance. During discussions about jury instructions, defendant’s counsel objected to instructing on lying in wait, arguing there “wasn’t sufficient evidence for” doing so. In response, the prosecution relied only on evidence provided by defendant’s “own statement.” The court agreed with the prosecution, stating: “The evidence supports those comments, including the evidence by Mr. Falconer who was an eyewitness to the shooting.”
Consistent with the preceding comments, in its opening argument to the jury after the close of evidence, with respect to the lying-in-wait special circumstance, the prosecution relied on defendant’s confession, the testimony of eyewitnesses, and inferences that could be directly and reasonably drawn from that direct evidence. Specifically, the prosecution argued: “Remember what all the testimony is here? Jimmy Falconer, the defendant, and Rick Delfín. What did they say happened here? Jimmy Falconer said it was like shooting fish in a barrel. They never gave them a chance. What does Rick Delfín tell you? I never saw him. I didn’t think he’d ever stop shooting. I was sitting in a police car looking at this other guy planning to go talk to this guy, Camacho, when this ambush assault occurred. What does the defendant say? They never looked at me. Why did you hide behind the car? They never seen me. What did you do when you popped up? I shot them when they weren’t looking. That’s an ambush. That’s what lying in wait is all about. This concealment, hiding of himself, is where you get the lying in wait. He sees the police officer, ducks down, and waits to see whether it’s necessary, whether it’s appropriate ... for him to begin shooting, whether it’s going to be necessary to kill the police officers, depending on their conduct. And he watches and he waits. And he sees what they do. And they kind of do what a gang member would expect, they go over and focus on the gang member that’s across the street on his way up to Toro’s house to ring the bell and kill Toro. As they’re approaching him getting ready to contact him and ultimately arrest him and prevent having Toro killed, this defendant instead of having *451 his homeboy arrested, the focus was on the police officer on the opposite side of the street. He discharged his assault weapon into Detective Black and killed him.”
As is readily apparent, in its opening argument, the prosecution relied on reasonable inferences from the direct evidence, and made no reference to expert testimony. However, in a completely separate part of its opening argument, the prosecution did expressly and precisely explain ‘“why gang experts [had been] called”: to address issues related to charges that had a gang component, e.g., ‘“intentional killing by an active street gang member” or ‘“an active participant in a criminal street gang,” ‘“crimes committed for the benefit of a criminal street gang,” engaging ‘“in a pattern of criminal gang activity,” ‘“the primary activities of the gang.” Thus, the record clearly demonstrates that, in its opening argument, the prosecution did not substantially rely on Sergeant Valdemar’s testimony to prove lying in wait; indeed, it did not rely on that testimony at all.
The majority ignores this clear record in concluding otherwise, i.e., in finding that the prosecution’s opening argument regarding the lying-in-wait special circumstance was ‘“unmistakably a reference to Sergeant Valdemar’s testimony.”[1] (Maj. opn., ante, at p. 420.) It then compounds this factual error with a legal one: engaging in a mode of analysis that we clearly rejected just four years ago. In McKinnon, the defendant based his argument that circumstantial evidence was ‘“central to the prosecution’s case,” such that a circumstantial evidence instruction should have been given, on ‘“the ‘quality’ of the evidence,” asserting that a finding of substantial reliance is appropriate when ‘“the quality of the direct evidence is weak, and the quality of the circumstantial evidence is strong.” (McKinnon, supra, 52 Cal.4th at p. 676 & fn. 40.) We rejected that argument, finding ‘“no persuasive authority for our consideration of [the quality of the evidence] in analyzing whether [an] instruction on circumstantial evidence was required.” (Id. at p. 676, fn. 40.) The majority’s reasoning here—that the circumstantial evidence ‘“was . . . critical to” the prosecution’s case ‘'because'' it was ‘“the principal evidence in support of the prosecution’s theory” (maj. opn., ante, at pp. 420-421, italics added)—is virtually the same argument we rejected in McKinnon—that the circumstantial evidence “was central to the prosecution’s case” (McKinnon, supra, at p. 676). It rests on the very “factor”—the relative “ ‘quality’ of the evidence”—we held in McKinnon should not be considered. (Id. at p. 676, fn. 40.) Adopting the mode of analysis we rejected in McKinnon, the majority in essence concludes that the prosecution substantially relied on Sergeant Valdemar’s testimony *452 because “the quality of [that] circumstantial evidence is strong” and “the quality of the direct evidence”—defendant’s confession and the eyewitness testimony—“is weak” as to the duration of the watching and waiting. (McKinnon, supra, 52 Cal.4th at p. 676, fn. 40.) Thus, the majority’s reasoning is not only factually inconsistent with the record, it is analytically contrary to our recent precedent.[2]
The majority correctly notes that the prosecution addressed Sergeant Valdemar’s testimony during its rebuttal argument (maj. opn., ante, at pp. 420-421), but the majority’s discussion of that circumstance is incomplete and misleading. According to the majority, the prosecution was “responding” to defense counsel’s “arguments that there was no premeditation or lying in wait.” (Id. at p. 420.) However, the record shows that, in fact, the prosecution was responding to defense counsel’s argument regarding “premeditation,” not lying in wait. Specifically, defense counsel charged that the prosecution had “brought” Sergeant Valdemar “in here because [it] knows that [its] evidence on premeditation is weak. So [it’s] trying to get Sergeant Valdemar up here to say, Oh, yes, if you see someone with a long gun, that means they’re prepared to shoot a policeman.” (Italics added.) In rebuttal, the prosecution responded that defense counsel’s “suggestion that Rich Valdemar was called because our case was weak is so far from the truth.” In its ensuing comments, the prosecution stated, among other things: “This is the way [criminal street gangs] deploy their troops. This is the way they commit these types of crimes. They do consider law enforcement’s presence. They do bring long arms in order to fend off police in the apprehension of their fellow gangsters.” Given that the prosecution was responding to defense counsel’s comments about the weakness of the evidence “on premeditation,” the jury no doubt understood this statement as directed at that issue, not at lying in wait.
In any event, although briefly discussing Sergeant Valdemar’s testimony, the prosecution, consistent with its focus during opening argument, spent most of its rebuttal emphasizing the inferences supported by the following direct evidence provided by defendant’s confession and the eyewitness testimony: (1) defendant went to a gang meeting where he and other gang members agreed to go to Toro’s house and shoot him in retaliation for an earlier drive-by shooting; (2) defendant retrieved a fully automatic assault weapon he had earlier loaded, and took it with him to shoot Toro; (3) as *453 defendant was exiting his parked car with the assault weapon, he saw the police officers approaching in their car and ducked down behind his car to conceal himself; (4) while he was behind the car, he continued watching the police as they moved down the street, approached his position, and started looking at Camacho; and (5) in order to prevent the officers from sending Camacho to jail for violating parole, defendant stood up and started shooting at them with the assault weapon. Under McKinnon, even assuming “the incriminating effect of’ Sergeant Valdemar’s testimony was “substantial,” because that testimony “complemented, and was merely corroborative of, defendant’s admissions” and other eyewitness testimony, the trial court “was not obligated to instruct on circumstantial evidence.”[3] (McKinnon, supra, 52 Cal.4th at p. 676.)
B. Any Error in Failing to Give a Circumstantial Evidence Instruction Was Harmless.
Even had the trial court erred in failing to give a circumstantial evidence instruction as to lying in wait, reversal would be unwarranted because there is no reasonable probability defendant would have obtained a more favorable result had the court given the instruction.
In concluding otherwise, the majority reasons (1) Sergeant Valdemar’s testimony “was the principal evidence” supporting “the prosecutor’s theory” that the period of watching and waiting began when defendant spotted the officers; (2) a properly instructed jury might have “discounted” Sergeant Valdemar’s testimony, which would have foreclosed the prosecutor’s theory; (3) absent Sergeant Valdemar’s testimony, “it is unlikely” the jury would have concluded that the period of watching and waiting began when defendant spotted the officers; (4) instead, given that defendant’s confession “makes no mention of any thought about killing the police until they approached Camacho,” the jury would likely have concluded that the period of watching and waiting did not begin until defendant “noticed the police looking at Camacho”; and (5) “it is unlikely” the jury would have concluded that “the very brief, indeterminate time between” the moment defendant saw the officers looking at Camacho and the moment defendant started shooting was *454 “sufficiently substantial” to prove the truth of the special circumstance allegation. (Maj. opn., ante, at pp. 422, 420.)
The majority’s analysis contains several errors. First, as demonstrated above, Sergeant Valdemar’s testimony was not the principal evidence on which the prosecution relied to prove lying in wait; instead, the prosecution relied principally on the direct evidence—defendant’s confession and the eyewitness testimony—and the reasonable inferences that direct evidence supported. Indeed, the prosecution did not even mention Sergeant Valdemar’s testimony until its rebuttal, and then only in response to defendant’s charge about the weakness of the prosecution’s case on premeditation. Thus, the discounting of Sergeant Valdemar’s testimony would not have foreclosed the prosecution’s theory; it would have had little, if any, effect on that theory.
Second, based on the direct evidence alone, it is highly likely the jury would have concluded that the period of watching and waiting began when defendant spotted the officers, and highly unlikely it would have concluded that the period did not begin until defendant saw the officers looking at Camacho. That direct evidence shows the following: Out of loyalty to his own gang and to retaliate against Toro’s gang for a drive-by shooting, defendant retrieved a fully automatic AR-15 assault weapon he had earlier loaded with about 30 rounds of ammunition, went to a meeting with other gang members, and made a plan to go together to Toro’s house and kill him. Pursuant to the plan, defendant, carrying the assault weapon, followed a car containing Camacho and other gang members to Toro’s street. There, after parking along the sidewalk, defendant started exiting his car with his weapon. He saw the officers approaching in a police car. At this point, Camacho, whom defendant knew to be violating parole by carrying a weapon, was already walking on the sidewalk, in plain view of the officers. Upon spotting the approaching police car, defendant did not throw his weapon away or flee. Instead, he ducked down behind his car, still holding the AR-15. But even when he ducked down, he did not completely conceal himself. Instead, he kept a close watch on the officers as they slowly moved closer to Camacho. With the police car still one or two car lengths away, defendant saw the officers looking at Camacho and decided he would shoot them in order to prevent them from taking Camacho to jail for violating parole. When the police car was right next to him, he opened fire, shooting at least 28 times. On this evidence, there is no reasonable chance that, absent Sergeant Valdemar’s testimony, the jury would have found that when defendant, a loyal gang member who had armed himself with a loaded, fully automatic assault weapon in order to carry out a retaliatory hit with Camacho and other members of his gang, spotted the officers approaching Camacho, ducked down with his weapon, and continued tracking the officers’ movements, he was not contemplating shooting them in order to protect Camacho. Instead, it *455 is highly likely the jury would have concluded that defendant began contemplating shooting the officers at virtually the moment he ducked down with his weapon and started tracking their movements as they slowly approached.
Third, under the instructions the jurors received, even had they concluded that the period began when defendant saw the officers looking at Camacho, there is no reasonable probability they would have reached a different conclusion based on the direct evidence. In his confession, defendant stated that the police car was “just like two cars—like one car” north of his position when he saw the officers looking at Camacho, and was “right next to” his position, “about 10 feet away,” when the shooting occurred. Defendant did not state that he started shooting as soon as the car pulled up right next to him. Detective Delfín, however, did provide relevant evidence on this point. He testified that, as he was driving down Lime Avenue, he “slowed up” upon spotting a double-parked car and “stopped about two car lengths behind” it. He then saw Camacho “by the back [of the] bumper” of the double-parked car and “made eye contact” with him. He “continued observing” and making “eye contact with” Camacho as Camacho “walked in an eastbound direction across Lime.” Based on his observations of Camacho’s “walk” and “mannerisms,” Detective Delfín “formed the opinion” that Camacho might be carrying a firearm. He decided to “go get this guy and talk to him,” but before he was able to exit his car, “someone started unloading on” him and Detective Black. Thus, the evidentiary record shows that, between the time defendant saw the officers looking at Camacho and the time defendant started shooting, the police car slowly moved forward one or two car lengths until stopping in a location right next to defendant, and Detective Delfín then watched Camacho walk across the street, made sustained “eye contact with” Camacho, observed Camacho’s walk and mannerisms long enough to form the opinion that he might be carrying a firearm, and made a decision to go talk to Camacho.
Under the jury instructions, on this direct evidence alone, there can be no doubt the jury would have found the period of watching and waiting sufficient. On this issue, the court correctly instructed the jury that “[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation and deliberation.” Only moments before giving that instruction, the court instructed the jury that “[t]he law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated,” that “the true test” for premeditation and deliberation “is not the duration of time but rather the extent of the reflection,” that “the slayer must weigh and consider the consequences and consider the question of killing and the reasons for and against such choice, and having in mind the consequences, he chooses to and does kill,” and that “[a] cold, calculated *456 judgment and decision may have been arrived at in a short period of time.” Under these instructions, the jury would surely have found that the ‘“duration” of the period was ‘“such as to show a state of mind equivalent to premeditation and deliberation” given the evidence that defendant, having watched the officers approach Camacho and decided to kill them when he saw them looking at Camacho, waited to begin firing long enough for them to drive slowly forward another one or two car lengths, stop their car right next to his position, make sustained eye contact with Camacho, and observe him long enough to form an opinion he might be carrying a firearm.
Indeed, the majority itself confirms this conclusion by holding that, as to the first degree murder conviction based on the ‘“theory of premeditation and deliberation,” any error in failing to give a circumstantial evidence instruction was harmless. (Maj. opn., ante, at p. 426.) As explained above, the prosecution’s remarks during rebuttal about Sergeant Valdemar’s testimony—as well as defense counsel’s remarks on that subject—were expressly directed, not at the issue of lying in wait, but at the issue of premeditation. The majority nevertheless finds no ‘“reasonable probability” that a circumstantial evidence instruction “would have resulted in a more favorable verdict” on the issue of premeditation and deliberation. (Ibid.) “The strong direct evidence of premeditation and deliberation,” the majority explains, “means that even if the jury discounted Sergeant Valdemar’s testimony,” “there is no reasonable chance it would have returned a second degree rather than first degree murder verdict.” (Ibid.) I agree. But the majority fails to explain how a jury that necessarily would have found the period to be of sufficient duration to constitute premeditation and deliberation would not necessarily also have found, in accordance with the trial court’s correct jury instructions on premeditation and lying in wait, the very same period to be of a “duration . . . such as to show a state of mind equivalent to premeditation and deliberation.” Thus, under the jury instructions, the majority’s harmless error finding with respect to premeditated and deliberate murder compels a similar conclusion with respect to lying in wait.
Rather than respond to this analysis, the majority mischaracterizes it. Contrary to the majority’s suggestion, I do not contend that a conclusion “there was insufficient evidence of’ lying-in-wait murder “mean[s] there was no premeditation and deliberation,” or that these different forms of murder “must be established by” the same “route.” (Maj. opn., ante, at p. 424.) Indeed, neither I nor the majority concludes “there was insufficient evidence of lying-in-wait.” {Ibid.) What I do contend is that given the majority’s correct conclusion that “there is no reasonable chance,” in light of “[fjhe strong direct evidence of premeditation and deliberation”—defendant’s “confession and the manner of killing”—that the jury would not have found that defendant had that mental state (id. at p. 426), it logically follows that “there is no reasonable chance” (ibid.), in light of that same direct evidence and the *457 applicable jury instructions, that the jury would not have found the period in question to have been of a “duration . . . such as to show a state of mind equivalent to premeditation and deliberation.” The majority fails to explain its contrary conclusion.
C. The Evidence Was Sufficient.
On the claim the majority does not reach—the sufficiency of the evidence—defendant contends only that the period of watching and waiting was of insufficient duration. He is incorrect.
“The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.” (People v. Stevens (2007) 41 Cal.4th 182, 202 [59 Cal.Rptr.3d 196, 158 P.3d 763] (Stevens).) We have never required a “fixed, quantitative minimum time” limit as to this requirement. (People v. Bonilla (2007) 41 Cal.4th 313, 333 [60 Cal.Rptr.3d 209, 160 P.3d 84].) “Indeed, the opposite is true, for we have previously explained that ‘[t]he precise period of time is . . . not critical.’ [Citation.]” (People v. Moon (2005) 37 Cal.4th 1, 23 [32 Cal.Rptr.3d 894, 117 P.3d 591].) “Even a short period of time is sufficient to overcome an inference that a defendant acted rashly. [Citation.]” (People v. Russell (2010) 50 Cal.4th 1228, 1245 [117 Cal.Rptr.3d 615, 242 P.3d 68].) As the trial court instructed the jury, the period “need not continue for any particular length ‘ “of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.” ’ ” (Stevens, supra, at p. 202, fn. omitted.)
Applying these principles and viewing the record, as discussed above, in the light most favorable to the judgment, I conclude that a reasonable trier of fact could find this element proved beyond a reasonable doubt by evidence that defendant, having carefully watched the officers from his hidden position and having decided to shoot them in order to prevent their apprehension of Camacho, then waited until they slowly pulled up next to him, stopped, and watched Camacho cross the street, before he stood up and opened fire. As the majority correctly concludes, this evidence provides “little indication that the murder was rash and impulsive.” (Maj. opn., ante, at p. 425.) Indeed, defendant’s behavior “dispel[s] any inference that he killed as a result of rash impulse”; it “is completely consistent with, and provides substantial evidence for, the watching and waiting element of the lying-in-wait special circumstance.” (Stevens, supra, 41 Cal.4th at p. 203; see People v. Lewis (2008) 43 Cal.4th 415, 511 [75 Cal.Rptr.3d 588, 181 P.3d 947] [evidence that the defendant watched the victim “for at least the time it took her to open the passenger door of her car and begin ‘doing something in . . . the backseat’ ” was sufficient to establish watching and waiting element].)
*458 2. Defense Counsel’s Erroneous Statements About Life Without the Possibility of Parole
During his closing argument in the penalty phase retrial, defense counsel told the jury that a sentence of life without the possibility of parole “means that you will never get out.” The prosecutor objected and, outside of the jurors’ presence, asserted that “case law does not allow you [to argue] an inaccurate statement.” The trial court commented that “the correct statement of the law is that you are to assume that it means that.” Defense counsel, without disagreeing with the court, then stated, “I would ask you to admonish them now.” The court did as defense counsel requested, telling the jurors: “Life without the possibility of parole, that sentence, you are to assume that it means that. That is the statement of the law. You are to assume [it] means life without the possibility of parole.” Defense counsel then added: “[Y]ou are to assume that that’s what it means because that’s what it does mean. It means that Ramon Sandoval will spend the rest of his life in a California maximum security prison.” The court interrupted counsel and stated: “The jury is not allowed to accept the statement that life without the possibility of parole means exactly what it is. You’re to assume that that’s what it means.”
Consistent with defense counsel’s failure to disagree with the trial court’s statement, defendant concedes on appeal that, under our case law, it was “permissible” for the court to tell the jury “to assume” that a sentence of life without the possibility of parole would result in a capital defendant “spending the rest of his/her life in prison.” Indeed, at the time of defendant’s penalty phase retrial in 2003, we had expressly so held in numerous cases.[4] (People v. Kipp (1998) 18 Cal.4th 349, 378-379 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; People v. Fierro (1991) 1 Cal.4th 173, 250 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; People v. Thompson (1988) 45 Cal.3d 86, 131 [246 Cal.Rptr. 245, 753 P.2d 37] {Thompson))
However, citing Thompson, defendant argues that the trial court prejudi-cially erred in precluding his counsel from telling the jury that a sentence of *459 life without the possibility of parole would “in fact result in the defendant never being released from prison,” and in ‘“correcting” his counsel’s statement that the sentence ‘“would actually result in life imprisonment.” The majority agrees with defendant. (Maj. opn., ante, at pp. 444-445.) For reasons that follow, I do not.
As the prosecution correctly asserted at trial in support of its objection, ‘“case law does not allow [counsel] to . . . argue an inaccurate statement.” ‘“Arguments of counsel [that] misstate the law are subject to objection and to correction by the court.” (Boyde v. California (1990) 494 U.S. 370, 384 [108 L.Ed.2d 316, 110 S.Ct. 1190].) Indeed, a trial judge has both ‘“the right” and ‘“the duty to curtail defense counsel,” not just the prosecution, ‘“from making incorrect or incomplete statements of law.” (People v. Ott (1978) 84 Cal.App.3d 118, 132 [148 Cal.Rptr. 479] (Ott).) Thus, although a court has discretion to ‘“allow counsel to incorporate correct statements of law in [their] argument,” ‘“it must sustain an objection to an incorrect statement of law . . . .” (People v. Suddutli (1966) 65 Cal.2d 543, 548 [55 Cal.Rptr. 393, 421 P.2d 401], italics added (Suddutli))
We have long and consistently held that telling jurors the defendant, if sentenced to life without the possibility of parole, will never be released and will remain in prison for the rest of his or her life, or will never be considered for parole and will not be paroled at any time, is ‘“an incorrect statement of the law.” (People v. Adams (2014) 60 Cal.4th 541, 581 [179 Cal.Rptr.3d 644, 336 P.3d 1223]; People v. Whalen (2013) 56 Cal.4th 1, 88 [152 Cal.Rptr.3d 673, 294 P.3d 915]; People v. Letner and Tobin, supra, 50 Cal.4th at p. 204; see People v. Smith (2003) 30 Cal.4th 581, 635 [134 Cal.Rptr.2d 1, 68 P.3d 302] (Smith) [it would be ‘“inaccurate” to tell jurors that a sentence of life without possibility of parole “ ‘means imprisonment for the rest of [the defendant’s] natural life’ ”].) Such statements are ‘“erroneous” in light of the Governor’s commutation and pardon powers and the possibility that the law’s sentencing provisions might be invalidated. (People v. Holt (1997) 15 Cal.4th 619, 688 [63 Cal.Rptr.2d 782, 937 P.2d 213].) As we have explained, ‘“[t]he Governor may ameliorate any sentence by use of the commutation or pardon power . . . . ” (People v. Arias (1996) 13 Cal.4th 92, 172 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Thus, under our decisions, the majority is simply incorrect in asserting, without citation of authority, that defense counsel’s remarks were ‘“legally accurate.” (Maj. opn., ante, at p. 445.)
It inexorably follows from these well-established principles that, upon the prosecution’s objection, the trial court in this case did not err in precluding defense counsel from making the incorrect argument that life without the possibility of parole ‘“means” that the defendant ‘“will never get out” and ‘“will spend the rest of his life in a California maximum security prison.” *460 Indeed, consistent with these principles and this conclusion, in Smith, supra, 30 Cal.4th at page 636, we unanimously rejected the defendant’s contention that the trial court had erred in ‘“sustain[ing] an objection when defense counsel started to argue that defendant would never have a parole hearing.” ‘“[Tjhis argument,” we reasoned, ‘“would have been inaccurate.” (Ibid.) Following Smith, we should similarly reject defendant’s argument.
In reaching a contrary conclusion, the majority ignores these bedrock principles and declines to follow Smith, choosing instead to rely entirely on dictum defendant cites from Thompson. As here relevant, our holding in Thompson was that the trial court had properly declined to instruct jurors that if they selected a death sentence, “ ‘the sentence will be carried out,’ ” and that if they selected life without the possibility of parole, “ ‘the defendant will never be released from prison.’ ” (Thompson, supra, 45 Cal.3d at p. 129.) Such an instruction is ‘“[injaccurate” and ‘“incorrect,” we explained, because it ‘“ignores” the superior court’s statutory power to reduce a sentence of death and the Governor’s power of commutation. (Id. at p. 130.) In a footnote, we added the following statement, which is the foundation of the majority’s conclusion: ‘“Defense counsel’s remarks to the jury during closing argument as to what life without possibility of parole would really mean and what an unending punishment it would be were . . . within the scope of legitimate argument to the extent the remarks impressed on the jury the gravity of its task.” (Id. at p. 131, fn. 29.)
The majority’s reliance on this statement is suspect for several reasons. First, it was obviously dictum; it was completely unnecessary to our holding, and thus does not, as the majority’s asserts, establish a ‘“rule.” (Maj. opn., ante, at p. 445.) Indeed, just three years after deciding Thompson, in People v. Ashmus (1991) 54 Cal.3d 932, 960-961, footnote 5 [2 Cal.Rptr.2d 112, 820 P.2d 214] (Ashmus), we not only noted that Thompson's discussion was ‘“dictum,” we declared it ‘“open to question.”
Second, nowhere in Thompson did we set forth what defense counsel actually said in his ‘“remarks to the jury during closing argument.” (Thompson, supra, 45 Cal.3d at p. 131, fn. 29.) For this separate and additional reason, Thompson's dictum does not ‘“set forth” a ‘“rule” (maj. opn., ante, at p. 445) that defense counsel, over the prosecution’s objection, is entitled to make the definitive, unqualified, and incorrect statement that a sentence of life without possibility of parole ‘“means” the defendant ‘“will never get out” and ‘“will spend the rest of his life in a California maximum security prison.” Indeed, a careful reading of Thompson suggests that, in fact, defense counsel’s remarks in that case were similar to the trial court’s statement in this case that jurors should assume the sentence would be carried out, not to the unqualified remarks of defendant’s counsel. In announcing our holding, we stated that, *461 because it is generally “beneficial” to “impress[] the jury with the weight of its responsibility,” “it was not necessarily error to suggest to them on voir dire that the sentence they decide on will be carried out.” (Thompson, at p. 131.) Notably, as our opinion discloses, this idea was suggested to the jurors on voir dire by telling them, as the trial court told the jurors here, “that they should assume the sentence they voted for, whether death or life without possibility of parole, would be carried out.” (Id. at p. 129, italics added.) As the majority explains, the footnote on which it relies “extended” this discussion of the comments during voir dire to defense counsel’s remarks during closing argument. (Maj. opn., ante, at p. 444; see Thompson, supra, at p. 131, fn. 29.) It is therefore logical to infer that the closing remarks were similar to those made during voir dire, i.e., that jurors should assume the sentence they voted for would be carried out.
This inference is supported by the third and final reason that the majority’s reliance on Thompson is suspect: in Thompson's dictum, we did not even mention a court’s “duty to curtail defense counsel from making incorrect . . . statements of law” (Ott, supra, 84 Cal.App.3d at p. 132) and to “sustain an objection to an incorrect statement of law” (Sudduth, supra, 65 Cal.2d at p. 548). Surely, we would have discussed these duties before holding that defense counsel is entitled to make incorrect and misleading statements to the jury during closing argument about the meaning of a life sentence. For all of these reasons, our dictum in Thompson is not support for the majority’s holding that, over the prosecution’s objection, defense counsel was entitled to make the erroneous arguments in question here.
Another good reason for rejecting the majority’s holding is the majority’s failure to consider the effect of that holding on the prosecution. We have long held that it is improper for the prosecution, in closing statement, to mention or suggest the possibility that the sentence the jury selects will not be carried out. (People v. Davenport (1985) 41 Cal.3d 247, 287-288 [221 Cal.Rptr. 794, 710 P.2d 861].) Thus, the prosecution has no way to respond to a defense counsel’s erroneous argument to a jury that life without the possibility of parole means the defendant will never be released and will die in prison. Neither, the majority holds, is the court entitled to correct defense counsel’s misstatement. I see no logic to, justification for, or fairness in a rule that uniquely entitles defense counsel to misstate the law to jurors without response or correction.
Certainly, as the record here demonstrates, the rule the majority announces is not needed to serve the goal Thompson mentioned: “impress[ing] on the jury the gravity of its task.” (Thompson, supra, 45 Cal.3d at p. 131, fn. 29.) In this case, defendant’s counsel ably accomplished this goal by telling jurors, after the trial court made its ruling, the following: “Well, okay. You’re *462 to assume that Ramon Sandoval will spend the rest of his life in a California maximum security prison. Even if he lives to be 100 years old, you’re to assume that’s where he’s going to die. In 10 years, 20 years from now, whenever your children graduate from college or graduate from high school, Ramon Sandoval will still be in a California maximum security prison. It’s not a gift. It is an extremely bleak environment. It’s one of the bleakest and most terrible environments that you can imagine. And in many ways, it’s worse [than] the death penalty. And the point I think we’re trying to make is that life without the possibility of parole is all that society demands in this case. Society will be safe.” Surely, these comments adequately “impress[ed] on the jury the gravity of its task.” (Ibid.)
Although we have cited Thompson’s dictum since declaring it ‘“open to question” in Ashmus, supra, 54 Cal.3d at pages 960-961, footnote 5, until today, we have never held that, over the prosecution’s objection, a defendant is entitled to make the incorrect statements at issue here. In People v. Nguyen (2015) 61 Cal.4th 1015 [191 Cal.Rptr.3d 182, 354 P.3d 90], after quoting Thompson’s ‘“dicta” {id. at p. 1087), we held that, because the trial court had “permitted” defense counsel to argue that life without possibility of parole “ ‘means for the rest of [the defendant’s] natural life he is going to be locked up in prison,’ ” the court did not err in precluding defense counsel from describing the measurements and features of the defendant’s prison cell (id. at p. 1088). In People v. Gutierrez (2002) 28 Cal.4th 1083, 1159 [124 Cal.Rptr.2d 373, 52 P.3d 572], we discussed Thompson’s dictum in holding that the trial court had not erred in rejecting the defendant’s proposed instruction that life without the possibility of parole “means ‘defendant will be imprisoned for the rest of his life,’ ” but “permitting] counsel to argue its substance before the jury.” In these decisions, we cited the fact that defense counsel had been permitted to make such comments “without objection” (Nguyen, supra, 61 Cal.4th at p. 1087) in rejecting claims that it was otherwise error to refuse a requested instruction or preclude counsel from making other arguments. In neither did we hold or suggest that where, as here, the prosecution objects, a trial court must allow defense counsel to make the incorrect arguments at issue in this case.[5] In short, there is no precedent in our case law supporting the majority’s conclusion.
On the other hand, there is precedent to the contrary; as explained above, in Smith, supra, 30 Cal.4th at page 636, we unanimously rejected a claim that the trial court had erred in “sustaining] an objection” to defense counsel’s argument “that defendant would never have a parole hearing,” reasoning that *463 this argument “would have been inaccurate.” The majority’s reasons for departing from Smith are erroneous and unpersuasive. We did not, as the majority asserts (maj. opn., ante, at p. 445), simply “note[j” in Smith, at page 636, that it was “inaccurate” for defense counsel to tell jurors that the defendant would “ ‘never have a parole hearing’ ” if sentenced to life without the possibility of parole. {Ibid.) That conclusion was our primary basis for rejecting defendant’s complaint that the trial court had “sustained an objection” to defense counsel’s “argument.” Contrary to the majority’s suggestion {ibid.), the force and authority of this conclusion are not lessened by our subsequent comment in Smith that, “[i]n any event,” because “both sides argued, without objection, that a life verdict would mean [the] defendant would die in prison,” “[t]he jury understood the significance of its choices.” (Smith, at p. 636, italics added.)
Nor is the majority correct in suggesting that we failed in Smith to provide an “explanation” for our conclusion. (Maj. opn., ante, at p. 445.) Earlier in the same paragraph, we held that the trial court had not erred in refusing to instruct the jury that life without the possibility of parole “ ‘means imprisonment for the rest of [the defendant’s] natural life,’ ” explaining that such an instruction “would have been inaccurate because the Governor has the power to commute a sentence. [Citations.]” (Smith, supra, 30 Cal.4th at p. 635.) We were clearly referring to this explanation when, in later rejecting the related claim that the trial court had erroneously “sustained an objection” to defense counsel’s similar argument, we stated: “Again, this argument would have been inaccurate.” (Id. at p. 636, italics added.)
Consistent with Smith and the well-established legal principles discussed above, we should hold that where, as here, the prosecution objects to defense counsel’s inaccurate and erroneous statements about the meaning of a sentence of life without the possibility of parole, a trial court does not err in sustaining that objection. We should not, as does the majority, now transform Thompson’s dictum—which cites no authority, fails to discuss established principles, and does not even identify the remarks in question—into a “rule” that a trial court commits error in precluding defense counsel, upon the prosecution’s objection, from making such misstatements. (Maj. opn., ante, at p. 445.)
Finally, even were I to adopt the majority’s rule and find error, like the majority, I would affirm for lack of prejudice. However, unlike the majority, I see no reason to analyze this issue under—or even to mention—the approach that some federal authorities have taken when the government fails to make a harmless error argument. (See maj. opn., ante, at pp. 445-446.) In his briefs, defendant nowhere mentions that approach, let alone urges us to adopt it. Thus, the majority has needlessly and improperly injected into this case an issue the parties have neither raised nor briefed.
*464 Moreover, the federal approach is clearly at odds with our state constitutional duty as a reviewing court. Article VI, section 13 of the California Constitution precludes a reviewing court from setting aside a judgment because of an instructional or procedural error “unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.” (Italics added.) As the majority explains, the “plain meaning of’ this binding constitutional provision “is that a reviewing court may not reverse a judgment without addressing harmless error,” even if the People fail to address that issue in their responding brief. (Maj. opn., ante, at p. 445.) Thus, even if, as the majority asserts, “some federal authorities have held that a reviewing court has discretion [not] to conduct a harmless error inquiry” under these circumstances {ibid.), a California reviewing court does not. In short, the government’s failure to offer “ ‘guidance’ ” on the issue of prejudice {ibid.) does not affect a California reviewing court’s constitutional duty to “exam-in[e] ... the entire cause, including the evidence" (Cal. Const., art. VI, § 13, italics added)—i.e., to “ ‘search[] the record’ ” (maj. opn., ante, at p. 445)—in determining whether there has been “a miscarriage of justice” (Cal. Const., art. VI, § 13). Neither is there any logical or persuasive reason why that failure should affect the standard a reviewing court applies to determine that same issue. In other words, whether the record establishes the constitutionally mandated criterion for reversal—“a miscarriage of justice” {ibid.)—should not depend in any way on whether the People make a harmless error argument. I disagree with the majority’s discussion insofar as it suggests otherwise.
Corrigan, J., concurred.

 Notably, although initially asserting that the prosecution’s argument was “unmistakably a reference to” Sergeant Valdemar’s testimony (maj. opn., ante, at p. 420), two paragraphs later, the majority characterizes the supposed reference as “oblique” (id. at p. 421). As I have explained, the record belies either characterization.

 The majority’s response—that Sergeant Valdemar’s testimony “did not bolster any direct evidence of the prosecution’s theory” (maj. opn., ante, at p. 421)—obviously overlooks the compelling inferences the direct evidence supports (see post, at pp. 454^-55) and our established rule, as stated above, that a circumstantial evidence instruction is not required where mental state is proved “by inference drawn from the direct evidence of [the] defendant’s conduct,” including the defendant’s own extrajudicial statements and the testimony of eyewitnesses. (People v. Wiley, supra. 18 Cal.3d at p. 175, italics added.)

 In another part of its opinion, the majority correctly holds that, with respect to the prosecution’s theory of premeditated and deliberate murder, no circumstantial evidence instruction was required because the prosecution emphasized the direct evidence—defendant’s confession and the manner of killing—and did not substantially rely on Sergeant Valdemar’s testimony. (Maj. opn., ante, at p. 426.) The majority fails to explain how it justifies reaching the opposite conclusion with respect to lying in wait, given that the prosecution’s remarks about Sergeant Valdemar’s testimony were expressly directed at the issue of premeditation, not lying in wait, and that the prosecution emphasized the same direct evidence in arguing both issues to the jury.

 In 2010, years after defendant’s retrial, we held that a trial court “did not err by refusing” to give such an instruction because stating that jurors “should ‘assume’ or ‘presume’ that the sentence will be carried out obscures the purpose of the instruction” and “is misleading in the sense that, although other presumptions and assumptions that juries are instructed to consider have their bases in logic and experience, a presumption or assumption that the sentence will be carried out is, in fact, contradicted by the real possibility, of which some jurors may be aware, that the sentence will not be carried out.” (People v. Letner and Tobin (2010) 50 Cal.4th 99, 206 [112 Cal.Rptr.3d 746, 235 P.3d 62].) We did not hold that courts that had followed our prior decisions and given such an instruction had erred, but we suggested that, “[i]n the future,” a court “might” instead instruct jurors that, in determining punishment, they “ ‘must not be influenced by speculation or by any considerations other than those upon which I have instructed you.’ ” (Ibid.)

 Moreover, in Gutierrez, we did not set forth the remarks the trial court permitted defense counsel to make (People v. Gutierrez, supra, 28 Cal.4th at p. 1159), so it is impossible to determine from our opinion whether those remarks were similar to the unqualified remarks at issue here.